**2014-1188**

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

GPX INTERNATIONAL TIRE CORPORATION, HEBEI STARBRIGHT TIRE CO., LTD., TIANJIN UNITED TIRE & RUBBER INTERNATIONAL CO., LTD.,

Plaintiff-Appellants, and

MINISTRY OF COMMERCE, PEOPLE'S REPUBLIC OF CHINA,

Plaintiff,

v.

UNITED STATES,

Defendant-Appellee, and

BRIDGESTONE AMERICAS, INC., BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC,

Defendants, and

TITAN TIRE CORPORATION, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC

Defendants-Appellees.

Appeals From The United States Court Of International Trade
Case No. 08-CV-00285, Judge Jane A. Restani

## BRIEF OF PLAINTIFF-APPELLANTS
## GPX INTERNATIONAL TIRE CORPORATION AND HEBEI STARBRIGHT TIRE CO., LTD.

Daniel L. Porter
James P. Durling
Matthew P. McCullough
Ross Bidlingmaier

Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 452-7373

Counsel for Plaintiff-Appellants GPX International Tire
Corporation and Hebei Starbright Tire Co., Ltd.

March 18, 2014

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**
No. 14-1188
**CERTIFICATE OF INTEREST**

Counsel for **Plaintiff-Appellants** GPX International Tire Corporation and Hebei Starbright Tire Co., Ltd. certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:
       **GPX International Tire Corp. and Hebei Starbright Tire Co., Ltd.**

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:
       **GPX International Tire Corp. and Hebei Starbright Tire Co., Ltd**.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:
       **Maine Industrial Tire acquired the assets of GPX International Tire Corp.**
       **Trelleborg Wheel Systems S.p.A. acquired the assets of Hebei Starbright Tire Co., Ltd.**

4. ☒    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:
*Curtis, Mallet-Prevost, Colt & Mosle LLP*: Daniel L. Porter, James P. Durling, Matthew P. McCullough, Ross Bidlingmaier and Christopher Dunn (previously of *Winston & Strawn LLP*) are representing Plaintiff-Appellant in this court.

*Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP*:  Fancis J. Sailer at the agency.

_____ March 18, 2014 _____                _____ Daniel L. Porter _____
          Date                                    {Printed Name}

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................ iv

STATEMENT OF RELATED CASES .......................................................... 1

JURISDICTIONAL STATEMENT ............................................................... 2

STATEMENT OF THE ISSUES ................................................................... 2

STATEMENT OF THE CASE ...................................................................... 3

STATEMENT OF THE FACTS .................................................................... 4

I.   SECTION 1(b) OF THE MARCH 2012 ACT VIOLATES DUE PROCESS
     RIGHTS GUARANTEED BY THE FIFTH AMENDMENT ......................... 21

     A.    Section 1(b) Of The March 2012 Act Lacks Any Rational Basis ......... 21

           1.    CVDs are a tax subject to specific due process restraints ........... 21

           2.    Section 1(b) of the March 2012 Act institutes a wholly new tax with
                 severe retroactive effect in violation of due process ................... 25

           3.    Curative intent is an inadequate justification for the March 2012
                 Act's retroactive effect ............................................................ 30

     B.    GPX Has A Vested Right In Its CVD Deposits .................................. 37

II.  SECTION 1(b) OF THE MARCH 2012 ACT VIOLATES THE *EX POST FACTO*
     CLAUSE OF THE CONSTITUTION ....................................................... 40

     A.    The Constitution Prohibits The Retroactive Application Of Penal
           Legislation ................................................................................... 40

     B.    When Congress Passed The March 2012 Act Applying The
           Countervailing Duty Law To Non-Market Economies Retroactively,
           Congress Applied A New Penalty To Conduct That Was Not Punishable
           At The Time It Was Committed ........................................................ 42

     C.    The March 2012 Act Imposed A Retroactive Penalty On Importers And
           Exporters From NME Countries And Thus Violated The Ex Post Facto
           Clause Of The Constitution ............................................................. 44

     D.    The First Prong of the *Huaiyin* Test Is Met Because The Act Imposes
           Penalties That Are Unrelated To The Actual Harm Suffered .............. 46

           1.    The March 2012 Act imposes additional penalties beyond what
                 could legally have been imposed for cases undertaken before 2012 ........... 46

           2.    The retroactive application of the CVD law was intended as a
                 punishment for Chinese exporters .............................................. 54

3.  The general "remedial" nature of the countervailing duty and antidumping laws has nothing to do with whether the particular retroactive application in the March 2012 Act is punitive ........................... 55

E.  The Second Prong of Proceeds of the *Huaiyin* Test Is Met Because Proceeds From The Retroactive Application Of Countervailing Duties Are Collected By The Federal Government ................................................................ 56

F.  The Third Prong of Proceeds of the *Huaiyin* Test Is Met Because The Retroactive Application Of The CVD Law Was Intended To Address A Harm To The Public, Rather Than Remedying A Harm To An Individual .......... 57

III.  BECAUSE THE NEW CVD LAW CANNOT BE APPLIED RETROACTIVELY, SECTION 1(B) MUST BE SEVERED FROM THE LEGISLATION AND THE CVD ORDER MUST BE TERMINATED ......................................................... 60

CONCLUSION AND RECOMMENDED APPELLATE REMEDY ......................................... 62

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AK Steel Corp. v. United States,*
    226 F.3d 1361(Fed. Cir. 2000) ....................................................................26

*Alaska Airlines v. Brock,*
    480 U.S. 678 (1987) ....................................................................................70

*Arjay Associates Inc. v. United States,*
    891 F.2d 894 (Fed. Cir. 1989) ...................................................................46

*Calder v. Bull,*
    3 U.S. 386 (1798) ..................................................................49, 50, 53, 56

*Canisius v. United States,*
    799 F.2d 18 (2d. Cir. 1986) ................................................................38, 39

*Cummings v. Missouri,*
    71 U.S. 277 (1868) ............................................................................49, 53

*Eastern Enterprises v. Apfel,*
    524 U.S. 498 (1998) ....................................................................................48

*Flemming v. Nestor,*
    363 U.S. 603 (1960) ...........................................................................50, 53

*Forbes Pioneer Boat Line v. Board of Commissioners,*
    258 U.S. 338 (1922) ...........................................................................43, 44

*Free Enterprise Fund v. Public Co. Accounting Oversight Board,*
    561 U.S. __, 130 S. Ct. 3138 (2010) ..................................................70, 71

*General Motors Corp. v. Romein,*
    503 U.S. 181 (1992) ...........................................................................38, 39

*Georgetown Steel Corp. v. United States,*
    801 F.2d 1308 (Fed. Cir. 1986) ................................................8, 32, 39, 59

*GPX International Tire Corp. v. United States,*
    645 F. Supp. 2d 1231 (Ct. Int'l Trade 2009) .......................................7, 8, 56

*GPX International Tire Corp. v. United States,*
    666 F. 3d 732 (Fed. Cir. 2011) .............................................................*passim*

iv

*GPX International Tire Corp. v. United States,*
893 F. Supp. 2d 1296 (Ct. Int'l Trade 2013) ............................................................*passim*

*GPX International Tire Corp. v. United States,*
942 F. Supp. 2d 1343 (Ct. Int'l Trade 2013) ............................................................3, 14

*Graham & Foster v. Goodcell,*
282 U.S. 409 (1931) ............................................................41, 42, 43

*Huaiyin Foreign Trade Corp. et al. v. United States,*
322 F.3d 1369 (Fed. Cir. 2003) ............................................................*passim*

*Ingalls Shipbuilding, Inc. v. Dalton,*
119 F.3d 972 (Fed. Cir. 1997) ............................................................54

*J.W. Hampton, Jr. & Co. v. United States,*
276 U.S. 394 (1928) ............................................................27

*MacLeod v. United States,*
229 U.S. 416 (1913) ............................................................45

*Norwegian Nitrogen Products Co. v. United States,*
288 U.S. 294 (1933) ............................................................46

*Pension Benefit Guaranty Corp. v. R.A. Gray,*
467 U.S. 717 (1984) ............................................................38

*Rafferty v. Smith, Bell & Co., Ltd.,*
257 U.S. 226 (1921) ............................................................45

*Regan v. Time, Inc.,*
468 U.S. 641 (1984) ............................................................70

*United States v. Carlton,*
512 U.S. 26 (1994) ............................................................*passim*

*United States v. Darusmont,*
449 U.S. 292 (1981) ............................................................29

*United States v. Heinszen & Co.,*
206 U.S. 370 (1907) ............................................................41, 42, 44

*United States v. Yoshida International, Inc.,*
526 F.2d 560, 63 C.C.P.A. 15 (Cust. Ct. 1975)............................................................45

## STATUTES

19 U.S. C. § 1677(7)(F) ............................................................................... 52

19 U.S.C. § 1504 ......................................................................................... 38

19 U.S.C. § 1675a ........................................................................................ 52

19 U.S.C. § 1677(18) .................................................................................... 15

19 U.S.C. § 1677(7)(C)(iii)(V) ............................................................... 12, 50

19 U.S.C. § 1677(7)(E)(i) ............................................................................. 50

## OTHER AUTHORITIES

Application of Countervailing Duty Provisions to Nonmarket Economy Countries, Pub. L. No. 112-99, 126 Stat. 265 (Mar. 13, 2012) (to be codified at 19 U.S.C. §§ 1671, 1677f-1) ................................................................ 3, 15, 16, 30

Applying Countervailing Duty Provisions to Nonmarket Economy Countries, 158 Cong. Rec. H1166-1173 (Mar. 6, 2012) ...................................... 12, 13, 64

Applying the Countervailing Duty Provisions of the Tariff Act of 1930 to Nonmarket Economy Countries, 158 Cong. Rec. S1375 (Mar. 5, 2012) ............................................. 11

Baucus, Thune Introduce Bill to Protect U.S. Jobs, Fight Unfair Chinese Subsidies with Countervailing Duties, Senate Finance Committee Press Release (Feb. 29, 2012) .......... 10

Blackstone's Commentaries, Vol. I, Ch. 8 ..................................................... 26

Camp, Levin, Brady, and McDermott Introduce Legislation to Ensure Commerce Department Can Continue to Apply Countervailing Duty Laws to Non-MarketEconomies Like China, House Ways and Means Committee Press Release (Feb. 29, 2012) ........................................................................... 11

*Initiation of Antidumping Duty Investigation: Certain New Pneumatic Off-the-Road Tires From the People's Republic of China* (hereinafter *"Off-the-Road Tires from China"*), 72 Fed. Reg. 43,591 (Dep't Commerce Aug. 6, 2007) .............................. 5

Letter to the Senate Finance Chair Max Baucus from USTR Ron Kirk and Comm. Sec. John Bryson (Jan. 18, 2012) ...................................................... 10

*Off-the-Road Tires from China: Final Affirmative Countervailing Duty Determination and Final Negative Determination of Critical Circumstances*, 73 Fed. Reg. 40,480 (Dep't Commerce Jul. 15, 2008) ......................................................... 6

*Off-the-Road Tires from China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 40,485 (Dep't Commerce Jul. 25, 2008)........................................................6

*Off-the-Road Tires from China: Notice of Amended Final Affirmative Determination of Sales at Less Than Fair Value and Antidumping Duty Order*, 73 Fed. Reg. 51,624 (Dep't Commerce Sept. 4, 2008)..........................................................................7

*Policies Regarding the Conduct of Five-year (``Sunset'') Reviews of Antidumping and Countervailing Duty Orders; Policy Bulletin* (Policy Bulletin 98-3), 63 Fed. Reg. 18,871 (Dep't Commerce April 16, 1998) ..............................................................62

Statement by the Press Secretary on H.R. 4105, The White House Office of the Press Secretary (Mar. 13, 2012).............................................................................................14

To Apply the Countervailing Duty Provisions of the Tariff Act of 1930 to Nonmarket Economy Countries, 158 Cong. Rec. S1441 (Mar. 7, 2012)...........................................12

## STATEMENT OF RELATED CASES

In response to Federal Circuit Rule 47.5(a), Plaintiff-Appellants are not aware of any other appeal in or from the same civil action or proceeding in the lower court that was previously before this court or any other appellate court.

In response to Federal Circuit Rule 47.5(b), Plaintiff-Appellants state that there is another case presently before this court that would affect one of the arguments in the instant appeal. Specifically, in *Wireking v. United States*, Ct. No. 13-1404, this court has before it a similar challenge to the same March 2012 legislation that is at issue it the instant appeal. And in *Wireking*, appellants made arguments concerning the *Ex Post Facto* Clause of the U.S. Constitution that are very similar to one of the arguments made in the instant appeal.[1]

---

[1] We note that at noon on the day this brief was filed, this court rendered its decision in *Wireking*. Plaintiffs will address that decision in subsequent briefing.

# JURISDICTIONAL STATEMENT

This court has jurisdiction to hear this appeal pursuant to 28 U.S.C.

§ 1295(a)(5), as an appeal from the U.S. Court of International Trade ("Trade

Court" or "lower court").  The lower court had jurisdiction under 28 U.S.C.

§ 1581(c), which provides jurisdiction over any action commenced with respect to

final Department of Commerce ("Commerce") determinations under 19 U.S.C.

§ 1516a.

This appeal is timely.  Plaintiff-Appellants GPX International Tire

Corporation ("GPX") and Hebei Starbright Tire Co., Ltd. ("Starbright") filed their

notice of appeal on December 27, 2013, within 60 days of the Trade Court's final

judgment issued on October 20, 2013.

# STATEMENT OF THE ISSUES

This case presents the following important issues of constitutional law for

this court to address and resolve:

> Whether the retroactive imposition of countervailing duties pursuant
> to Section l(b) of Pub. L. No. 112-99, 126 Stat. 265 (2012), is
> unconstitutional because it violates due process rights guaranteed by
> the Fifth Amendment to the Constitution.

> Whether the retroactive imposition of countervailing duties pursuant
> to Section l(b) of Pub. L. No. 112-99, 126 Stat. 265 (2012), is
> unconstitutional because it violates the *Ex Post Facto* Clause of
> Article I, Section 9 of the Constitution.

## STATEMENT OF THE CASE

This appeal concerns the countervailing duty ("CVD") investigation of certain new pneumatic off-the-road tires from the People's Republic of China, and the imposition of a CVD order against such imports. Plaintiff-Appellants GPX and Starbright appeal from the final judgment of the Court of International Trade in *GPX International Tire Corp. v. United States*, 942 F. Supp. 2d 1343 (Ct. Int'l Trade 2013), JA 1. Copies of the Trade Court opinion and order are attached to this brief.

Although the appeal is from a Trade Court decision affirming the U.S. Department of Commerce's ("Commerce") final CVD determination, the only legal issues presented in this appeal concern the constitutionality of the statutory provision retroactively imposing countervailing duties. This provision is found in the Application of Countervailing Duty Provisions to Nonmarket Economy Countries, Pub. L. No. 112-99, 126 Stat. 265 (Mar. 13, 2012) (the "March 2012 Act"). The March 2012 Act responded to this court's decision in *GPX International Tire Corp. v. United States,* 666 F.3d 732 (Fed. Cir. 2011) ("*GPX V*"), which held that Commerce had no authority under the then-exising law to apply CVD measures to non-market economy ("NME") countries such as China.

The March 2012 Act imposes a wholly new tax far back in time, and thus violates due process rights guaranteed by the Fifth Amendment to the Constitution.

3

In addition, the March 2012 Act makes punishable conduct that was not punishable when it was committed and increases the punishment beyond that which applied at the time, and thus violates the *Ex Post Facto* Clause of Article I, Section 9 of the Constitution. For both reasons, Commerce's CVD determination and order are unlawful under this court's *GPX V* decision.

## STATEMENT OF THE FACTS

We set forth below a brief recitation of the key facts concerning (a) the underlying countervailing duty ("CVD") and antidumping ("AD") investigations, (b) the proceeding before the Trade Court challenging those determinations, (c) the outcome of the *GPX* litigation, (d) the events leading to the passage of the March 2012 Act, (e) this court's initial review of the March 2012 Act and (f) the Trade Court's subsequent decision addressing the constitutionality of the retroactive provisions of the March 2012 Act.

### <u>Underlying Commerce Proceedings</u>

On June 18, 2007, the domestic industry filed AD and CVD petitions with Commerce and the U.S. International Trade Commission ("ITC") seeking the imposition of AD and CVD duties against imports of certain new pneumatic off-the-road tires from the People's Republic of China. On July 30, 2007, Commerce initiated its CVD investigation of calendar year 2006. Commerce also initiated its

AD investigation on the same day, stating that it still considered China to be a "non-market economy country" and, therefore, Commerce would employ its special NME calculation methodology. *Initiation of Antidumping Duty Investigation: Certain New Pneumatic Off-the-Road Tires From the People's Republic of China* (hereinafter *"Off-the-Road Tires from China"),* 72 Fed. Reg. 43,591, 43,593 (Dep't Commerce Aug. 6, 2007), JA 111.

On July 15, 2008, Commerce issued its final CVD determination finding that Starbright received countervailable subsidies. *Off-the-Road Tires from China: Final Affirmative Countervailing Duty Determination and Final Negative Determination of Critical Circumstances*, 73 Fed. Reg. 40,480 (Dep't Commerce Jul. 15, 2008), JA 118. Commerce calculated a CVD rate for Starbright of 14 percent. *Id.* at 40,483. Commerce issued its final AD determination on the same day, finding that, upon applying its special NME AD methodology, Starbright made U.S. sales of subject merchandise at less than fair value. *Off-the-Road Tires from China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances,* 73 Fed. Reg. 40,485, 40,489 (Dep't Commerce Jul. 25, 2008), JA 123. In amended results Commerce calculated an AD rate for Starbright equal to 29.93 percent. *Off-the-Road Tires from China: Notice of Amended Final Affirmative Determination of Sales at Less*

*Than Fair Value and Antidumping Duty Order*, 73 Fed. Reg. 51,624, 51,625
(Dep't Commerce Sept. 4, 2008), JA 132.

### Initial Appeal to the Court of International Trade

GPX and Starbright commenced appeals of both the Commerce CVD and
AD determinations at the Trade Court on September 9, 2008. In *GPX
International Tire Corp. v. United States*, 645 F. Supp. 2d 1231 (Ct. Int'l Trade
2009) ("*GPX II*") the Trade Court held that Commerce's decision to apply the
CVD statute to an NME country without accounting for the concurrent imposition
of antidumping duties on OTR tires was unreasonable because "without some type
of adjustment . . . the imposition of AD duties could well result in a double
remedy." *Id.* at 1242. The Trade Court explained that "Commerce reasonably can
do all of its remedying though the NME AD statute, as it likely accounts for any
competitive advantages the exporter received that are measurable." *Id*. at 1243.
Commerce appealed the Trade Court's decision to this court.

### This Court's GPX Decision

In December 2011, this court rendered its decision on the proper scope of
CVD measures under the law then in effect, concluding that "countervailing duties
cannot be applied to goods from NME countries." *GPX International Tire Corp. v.
United States*, 666 F. 3d at 745 ("*GPX V*"). The starting point for this court's legal

analysis was its own decision in *Georgetown Steel Corp. v. United States*, 801 F.2d

1308 (Fed. Cir. 1986):

> In *Georgetown Steel* we found that the 'economic incentives and benefits' provided by governments in NME countries 'do not constitute bounties or grants under section 303 {citation omitted} that is 'countervailable subsidies' in the language of the current statute. *Georgetown Steel* found "no indication …. that Congress intended" this law to apply to NME exports, noting that the purpose of the countervailing duty law is "to offset the unfair competitive advantage that foreign producers would otherwise enjoy from export subsidies' and that in exports from a nonmarket economy this kind of unfair competition cannot exist." {citation omitted} . . . We thus upheld Commerce's decision not to impose countervailing duties on goods from NME countries.

*GPX V*, 666 F.3d at 738.

This court went on to find that, since 1986, Congress had repeatedly

considered the issue, had repeatedly acknowledged *Georgetown Steel* as the

controlling interpretation of the statute, and had repeatedly chosen not to expand

the law to give Commerce the authority to impose CVDs against NME countries.

*Id.* at 740.  The court concluded that "if Commerce believes that the law should be

<u>changed</u>, the appropriate approach is to seek legislative change." *Id.* at 745

(emphasis added).

### The New March 2012 Act Expanding the CVD Law

The *GPX V* opinion was published on December 19, 2011.  On January 18,

2012, the Administration sent an "urgent" letter to Congress laying the

groundwork for new legislation to preempt this court's decision. *See* Letter to the Senate Finance Chair Max Baucus from USTR Ron Kirk and Comm. Sec. John Bryson (Jan. 18, 2012). JA 136. The letter also noted the need to comply with U.S. "international obligations," but did not otherwise discuss the double-remedy issue or the need for an offset to AD duties.

H.R. 4105 and S. 2153 were introduced on February 29, 2012 with identical provisions. Both proposals contained asymmetrical provisions on retroactivity – applying the CVD law to China both prospectively and retroactively, but applying a new statutory adjustment for double-counting only prospectively. The accompanying press releases stressed the need to reverse this court's decision and the need to "hold China responsible" and "to stop China" so as to save American jobs. *See* Baucus, Thune Introduce Bill to Protect U.S. Jobs, Fight Unfair Chinese Subsidies with Countervailing Duties, Senate Finance Committee Press Release (Feb. 29, 2012), JA 138, and Camp, Levin, Brady, and McDermott Introduce Legislation to Ensure Commerce Department Can Continue to Apply Countervailing Duty Laws to Non-Market Economies Like China, House Ways and Means Committee Press Release (Feb. 29, 2012), JA 139. Both press releases also addressed the need to reduce the AD margins to account for any double-counting, and thus comply with U.S. international obligations. Neither press release mentioned the asymmetrical provisions on retroactivity.

Other than letters and press releases, there is virtually no other legislative history for this new law. There were no House or Senate hearings. There were no House or Senate reports. S. 2153 passed the Senate by unanimous consent. *See* Applying the Countervailing Duty Provisions of the Tariff Act of 1930 to Nonmarket Economy Countries, 158 Cong. Rec. S1375 (Mar. 5, 2012). JA 141. H.R. 4105 passed the House under suspension of the rules. *See* Applying Countervailing Duty Provisions to Nonmarket Economy Countries, 158 Cong. Rec. H1166-1173 (Mar. 6, 2012). JA 143. The Senate then passed H.R. 4105 by unanimous consent. *See* To Apply the Countervailing Duty Provisions of the Tariff Act of 1930 to Nonmarket Economy Countries, 158 Cong. Rec. S1441 (Mar. 7, 2012). JA 151.

There was no debate at all in the Senate and only very limited debate in the House. During a brief 32-minute period before the vote, several House Members offered brief floor statements on the legislation. These statements criticized this court's decision, and repeatedly singled out China as the target of the legislation. Representative Camp emphasized that "China distorts the free market." Representative Levin emphasized the need "to hold China and other nations accountable" and "to rein in China's abusive trade practices." 158 Cong. Rec. H1167. JA 144. Representative Rohrabacher elaborated that China "supports every rogue enemy of the United States." 158 Cong. Rec. H1168. JA 145.

9

Beyond the focus on China, there was also repeated condemnation of "illegal" subsidies by Representative Pascrell, H1169 ("illegal subsidies"), Representative Michaud, H1170 ("illegally subsidized"), and Representative Slaughter, H1170 ("illegal Chinese subsidies"). JA 147. There was also much discussion of the need to apply the CVD law to China to address these "illegal" subsidies, and occasional acknowledgement of the need to make adjustments for double-counting to comply with the WTO, but no discussion or acknowledgement of the asymmetrical provisions on retroactivity. There was no explanation of why the adjustment that Congress deemed necessary prospectively was not also applied retroactively along with the expansion of the scope of the CVD law.

It took Congress just nine days to introduce, pass, and present this substantive international trade legislation to the President for his signature on March 8, 2012. The President signed the new legislation into law on March 13, 2012. A White House press release acknowledged the need to apply the CVD law to China, and the need to adjust for double-counting, but also ignored the asymmetry in how these new rules would apply. *See* Statement by the Press Secretary on H.R. 4105, The White House Office of the Press Secretary (Mar. 13, 2012). JA 152.

The March 2012 Act mirrors H.R. 4105 and S. 2153 exactly, and contains several specific provisions relevant to constitutional law issues in this case:

- Section 1(b) extends the effective date of Section 1(a) back more than five years to November 20, 2006;

- Section 1(b) also makes clear that the retroactivity applies to all CVD proceedings by Commerce, "all resulting actions" by Customs, and all "civil actions, criminal proceedings, and other proceedings" before a Federal court in connection with the administrative actions by Commerce and Customs;

- Section 2(a) amends the AD law to make an adjustment to the dumping margin for nonmarket economy countries for double-counting, when certain conditions have been met; and

- Section 2(b) limits the applicability of Section 2(a) to determinations made on or after March 13, 2012.

*See* Application of Countervailing Duty Provisions to Nonmarket Economy Countries, Pub. L. No. 112-99, 126 Stat. 265 (Mar. 13, 2012) (to be codified at 19 U.S.C. §§ 1671, 1677f-1) ("March 2012 Act"). Collectively, these provisions establish the following basic points about the March 2012 Act.

First, the retroactivity provisions are asymmetrical. The March 2012 Act applies the CVD law to NME countries retroactively for more than five years, but applies the adjustment mandated by the World Trade Organization ("WTO") to avoid double-counting only prospectively from the date of enactment. The various press statements and House debate acknowledged the WTO requirement, yet the March 2012 Act does not apply the double-counting adjustment retroactively.

11

Second, the March 2012 Act provides no mechanism for the U.S. ITC to reconsider its injury determinations for the current AD or CVD orders. Under the law, the ITC "shall evaluate … the magnitude of the margin of dumping." 19 U.S.C. § 1677(7)(C)(iii)(V). But there is no mechanism under the March 2012 Act either to reissue the original AD determination based on corrected AD margins, or to reevaluate the material injury finding in light of any AD margins lowered by the offset for double-counting. Although future injury determinations will reflect properly-adjusted AD margins, past injury determinations and any future proceedings that look to the rates announced in the original investigation remain tainted by the higher margins that reflect the WTO-inconsistent double-counting.

Third, Congress explicitly recognized that the enforcement of the CVD law involves a combination of civil and criminal proceedings. That is why Section 1(b) addresses "all resulting actions by" Customs, including actions for criminal customs fraud and specifically references "criminal proceedings" by Federal courts in connection with CVD determinations. 126 Stat. 265. An importer that does not pay the proper duty – by asserting on the import paperwork that the goods are not subject to the CVD order – faces possible criminal penalties.

## This Court's Actions Subsequent To The March 2012 Act

Shortly after enactment of the March 2012 Act, this court requested and received five-page "letter briefs" from the parties concerning the impact of the new law on the case. On May 9, 2012, this court rendered a subsequent decision that addressed the effect of the new law. *GPX Int'l Tire Corp. v. United States*, 678 F.3d 1308 (Fed. Cir. 2012) ("*GPX VI*"). It determined that, on its face, the March 2012 Act applied to all CVD cases initiated after November 2006, including those CVD cases for which an appeal had been made. It noted that "in order to implement World Trade Organization ('WTO') requirements," the new CVD legislation also contained a double-counting adjustment mechanism, but that adjustment did not apply retroactively. *GPX VI,* 678 F.3d at 1311.

This court's decision *also* noted the arguments by GPX that the retroactive application of the CVD law was unconstitutional. Accordingly, this court remanded the *GPX* case to the Trade Court for proper briefing and "a determination of the constitutionality of the new legislation." *Id.* at 1313. On May 16, 2012, this court issued its mandate for the *GPX* case, and then issued an amended mandate on June 4, 2012, returning the case back to the Trade Court.

**<u>Renewed Proceeding Before Trade Court</u>**

In renewed proceedings before the Trade Court on the constitutional issues, the Trade Court found, *inter alia*, that "GPX has failed to show by the clearest proof that the March 2012 Act rises to the level of retroactive penal legislation falling within the scope of the Ex Post Facto Clause." *GPX International Tire Corp. v. United States*, 893 F. Supp. 2d 1296, 1311 (Ct. Int'l Trade 2013) ("*GPX VII*"). It also found that "GPX has failed to demonstrate that the government did not have a rational basis in enacting the New Law or that the New Law upended a vested right." *Id*.

In this decision, the Trade Court also remanded the case to Commerce for reexamination of CVD calculation issues. The Trade Court then affirmed Commerce's remand determination and entered final judgment. *GPX International Tire Corp. v. United States*, 942 F. Supp. 2d 1343 (Ct. Int'l Trade 2013).

GPX and Starbright now appeal the Trade Court decision on the issues of constitutional law to this court.

# SUMMARY OF ARGUMENT

Although Congress can change the law prospectively, Plaintiff-Appellants GPX and Starbright strongly disagree with the retroactive application of the March 2012 Act. This retroactivity violates due process rights guaranteed by the Fifth Amendment to the Constitution and also runs afoul of the *Ex Post Facto Clause* of the Constitution.

The March 2012 Act constitutes a wholly new tax targeting activities never before considered to create subsidies. Indeed, the existing law changed by the March 2012 Act presumed that subsidies do not and could not exist in NMEs, consistent with the plain definition given NMEs within the statute itself. *See GPX V*, 666 F.3d at 738 and 19 U.S.C. § 1677(18). Such a change to create a wholly new tax may not be applied retroactively. *See United States v. Carlton*, 512 U.S. 26, 34 (1994) (citations omitted).

Importers and exporters also had no notice of Congress' intent to extend the CVD law to NME imports retroactively back more than five years. Instead, importers like GPX reasonably chose courses of action – exporting and entering goods subject to a plainly unlawful Commerce investigation – that definitively left them in a position worse off after Congress acted than had Congress not acted at all, implicating due process rights. *See United States v. Hemme*, 476 U.S. 558,

15

569-570 (1986).  Moreover, the decision to enter the goods was entirely voluntary and constituted transactions not unlike gifts made before enactment of a taxing statute.  Such transactions are of a kind the importer "might well have refrained from making had {they} anticipated the tax," and therefore such new taxes are "so arbitrary and oppressive as to be a denial of due process."  *Welch v. Henry*, 305 U.S. 134, 147 (1938).

Even if the extension of the CVD law to NMEs is not considered a "wholly new tax," the more than five-year retroactive period provided under Section 1(b) of the new law far exceeds the "modest period of retroactivity" referred to by the Supreme Court in *Carlton*.  512 U.S. at 32.  Section 1(b) of the legislation exceeds the roughly one-year period normally afforded acts of Congress in a tax context, and therefore "raises serious constitutional questions," *id*. at 38, and denies fundamental due process rights under the Constitution.

Curative intent is not a sufficient rationale to justify this denial of due process.  More specifically, curative intent must have limits if rational basis review is to have any meaning.  If Congress could merely claim "curative intent," a standard that is inherently self-fulfilling, rational basis review of retroactive legislation would become a virtual nullity.  One must still carefully consider the facts.  In this case, no defect in the then existing statute existed, and defects in the

administration of the statute that transpired did not flow from once valid conduct. Thus, any purported curative intent is illusory and cannot justify the retroactive effect of the March 2012 Act.

To be certain, GPX has a vested right in the collected countervailing duties. Although GPX agrees that no one has a vested right to trade with foreign nations, or in the maintenance of an existing rate of duty at the time of importation, in this case GPX's rights vested when its duty deposits should have liquidated. GPX could in fact quantify its interest in those CVD deposits. It owed none and therefore was entitled to all that were collected. Importantly, the continued suspension of liquidation of GPX's duty deposits in this case is the direct consequence of GPX challenging the legal authority to impose CVDs on its entries. It would be a grave injustice to deem GPX lacked any vested interest or forfeited its interests because it took the very measures prescribed under the law intended to preserve its interests. Given these facts, GPX must be found to have a vested right.

The March 2012 Act's selective retroactivity violates another fundamental constitutional principle, by retroactively targeting a particular group, and then punishing conduct by that group not illegal or punishable at the time it was committed. Such retroactive penalties violate the *Ex Post Facto* Clause of the Constitution.

Article I, Section 9 of the Constitution flatly prohibits Congress from enacting any *ex post facto* laws. The Supreme Court has repeatedly found that this prohibition is not limited to criminal statutes, but includes civil statutes that either retroactively punish conduct that was not punishable when it was committed, or increases the punishment beyond that which applied at the time the conduct occurred. The question is whether retroactive legislation is penal or punitive in nature.

The March 2012 Act at issue in this case both makes punishable conduct that was not punishable when committed, and increases the punishment beyond that which applied at the time. This court in 2011 held that the CVD law then in effect did not apply to NME countries such as China. *GPX V*, 666 F.3d at 745. The March 2012 Act then *changed* the law as found by this court, specifically expanding the scope of the law to apply to NME countries for the first time. By making the CVD law retroactively applicable to NME countries from 2006 forward, the legislation imposed a penalty on conduct – receiving subsidies – that had not been subject to that penalty at the time it occurred. And by failing to provide retroactively any offset to antidumping duties to prevent double-counting of duties, the legislation also increased penalties beyond even those that apply prospectively under the new law. Therefore the new legislation meets the definition of an impermissible *ex post facto* law, and is unconstitutional.

18

This court has developed a succinct, practical test to determine whether legislation imposes a penalty for purposes of constitutional analysis.  In *Huaiyin Foreign Trade Corp. et al. v. United States*, 322 F.3d 1369 (Fed. Cir. 2003), this court established a three-pronged test to make this determination.  The March 2012 Act satisfies each of the three prongs set forth in *Huayin* and does so in the clearest possible terms.  The very language and structure of the March 2012 Act confirms its penal nature.

First, the costs imposed related more to the penalized party's conduct, and not the amount of actual harm suffered.  The CVD penalties imposed retroactively by the March 2012 Act exceed what the law provided was proportionate to the injury caused by unfairly low prices.  The March 2012 Act imposed new duties beyond the special NME AD duties that were previously deemed the complete, exclusive, and sufficient remedy for the harm.  Further, by providing no offset to antidumping duties to prevent double-counting, the March 2012 Act exceeded the proportionality between duties and harm that Congress itself felt was necessary for investigations initiated after March 2012.

The March 2012 Act is also more related to the parties' conduct than to establishing any relationship between duties and the harm.  This focus on conduct is reflected in the floor statements of several members of the House of

Representatives, who sought to punish China for providing "illegal subsidies" and punish those who received and benefited from these subsidies. This punitive intent can also be seen by the legislation explicitly denying any offset to prevent double-counting of CVD and AD duties for cases initiated between 2006 and March of 2012, while providing that very offset for cases initiated after March of 2012.

The second and third tests of the court's test in *Huaiyin* are equally satisfied. The proceeds from the law (antidumping and countervailing duties) go into the Treasury's general revenues and do not compensate anyone for any harm suffered. And the statute is clearly intended to address a harm to the public – the "illegal" subsidies conferred by China – rather than any harm to an individual, since no individual receives any compensation for harm suffered.

The retroactive imposition of the CVD law under the March 2012 Act thus clearly represents a penalty under the test established by this court in *Huayin*, and thereby constitutes an improper *ex post facto* law prohibited by the Constitution.

## ARGUMENT

This court upholds Commerce AD/CVD determinations supported by substantial evidence and otherwise in accordance with law. This court reviews *de novo* questions of law, including questions of statutory interpretation. *See, e.g., AK Steel Corp. v. United States*, 226 F.3d 1361, 1366 (Fed. Cir. 2000).

## I. SECTION 1(b) OF THE MARCH 2012 ACT VIOLATES DUE PROCESS RIGHTS GUARANTEED BY THE FIFTH AMENDMENT

### A. Section 1(b) Of The March 2012 Act Lacks Any Rational Basis

#### 1. CVDs are a tax subject to specific due process restraints

"Duties" have historically and universally been understood to constitute a tax. *See* Blackstone's Commentaries, Vol. I, Ch. 8, pp. 314-18 (discussing "{t}he customs; or the duties, toll, tribute, or tariff, payable upon merchandise exported and imported" among the "perpetual taxes"). The very power of the Federal Government to levy duties is found under the Taxing and Spending Clause of the U.S. Constitution, U.S. Const. art. I, § 8, cl. 1, and the term tax and duty have been used interchangeably by the courts in addressing the Federal Government's authority to tax foreign commerce. *See, e.g., J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 411 (1928) ("{N}o historian, whatever his view of the wisdom of the policy of protection, would contend that Congress, since the first

21

revenue Act in 1789, has not assumed that it was within its power in making

provision for the collection of revenue to put taxes upon importations . . . .").

Although Congress may enact retroactive taxes in a manner that does not

offend due process rights under the Fifth Amendment, the Supreme Court has

"never intimated that Congress possesses unlimited power to 'readjust rights and

burdens . . . and upset otherwise settled expectations.'" *Carlton*, 512 U.S. at 37

(O'Connor, J., concurring) (citations omitted). "The governmental interest in

revising the tax laws must at some point give way to the taxpayer's interest in

finality and repose." *Id*. at 37-38. To determine whether a retroactive tax survives

scrutiny under the Fifth Amendment, it is "necessary to consider the nature of the

tax and the circumstances in which it is laid before it can be said that its retroactive

application is so harsh and oppressive as to transgress the constitutional

limitation." *Hemme*, 476 U.S. at 568 (quoting *Welch v. Henry*, 305 U.S. 134, 147

(1938)).

The harsh and oppressive standard applied by the Supreme Court in prior

cases has produced a few key considerations that govern this case. First,

borrowing from cases that predate the *Hemme* articulation of the standard, the

Supreme Court has stated that "wholly new taxes" may not be applied retroactively

at all. *Carlton*, 512 U.S. at 34. This prohibition against "wholly new taxes" may

be viewed in the context of proper notice. As explained by Justice O'Connor in her concurring opinion, "{b}ecause the tax consequences of commercial transactions are a relevant, and sometimes dispositive, consideration in a taxpayer's decisions regarding the use of his capital, it is arbitrary to tax transactions that were not subject to taxation at the time the taxpayer entered into them." *Id*. at 38.

Second, the principle of notice has been paired with the issue of consequences to affected taxpayers in analyzing whether retroactive application violates due process. In *Hemme*, the Supreme Court confirmed that "one of the relevant circumstances is whether, without notice, a statute gives a different and more oppressive legal effect to conduct undertaken before enactment of the statute." *Hemme*, 476 U.S. at 569. To that end, the Court found relevant whether taxpayers were "no worse off than they would have been without the enactment" of the retroactive legislation. *Id*. at 570.

Another important aspect of "notice and consequence" analysis is whether the retroactive measure applied to the voluntary act of the taxpayer that would have been avoided had proper notice been effected. In *Welch*, the Court distinguished challenges of retroactive measures that applied to voluntary acts, such as the award of gifts made and completely vested before the enactment of the taxing statute, as

23

opposed to challenges of retroactive measures that apply to incidents such as income.  According to the Court, the former measure presented a question of reasonable avoidance that implicated due process, whereas the later measure involved only "the particular inconvenience of the taxpayer in being called upon, after the customary time for levy and payment of the tax has passed, to bear a governmental burden of which it is said he had no warning and which he did not anticipate." *Welch*, 305 U.S. at 147-48.

Finally, in *Carlton*, the Supreme Court reaffirmed that it was important to look to the period of time it took to enact the legislation at issue to determine whether a period of retroactivity exceeded the boundaries of due process.  512 U.S. at 32.  The Court noted that Congress generally has confined the retroactivity of tax statutes "to short and limited periods required by the practicalities of producing national legislation." *Id.* at 33 (quoting *United States v. Darusmont*, 449 U.S. 292, 296-97 (1981)).  In the context of taxes, the "modest period of retroactivity" referred to by the Court in *Carlton*, 512 U.S. at 32, has exceeded roughly one year in only rare instances, such as when a legislature meets only biannually.  "{A} period of retroactivity longer than the year preceding the legislative session in which the law was enacted would raise . . . serious constitutional questions." *Id.* at 38 (O'Connor, J., concurring); *see also Nations Bank v. United States* 269 F.3d

1332, 1337 (Fed. Cir. 2001) (citing *Carlton* in upholding a limited eight-month

retroactive treatment).

> **2.    Section 1(b) of the March 2012 Act institutes a wholly new tax with severe retroactive effect in violation of due process**

Section 1(b) of the March 2012 Act implicates and fails all three

considerations cited above discussed by the Supreme Court in determining whether

a retroactive tax violates due process rights guaranteed by the Fifth Amendment.

First, Section 1 of the March 2012 Act retroactively introduces a wholly new

tax under U.S. law.  The new law expressly includes NMEs within the scope of

Section 701 of the Tariff Act of 1930, something never part of U.S. law.  Sec. 1,

126 Stat. 265.  A long and unambiguous legislative history reflects that under the

prior law Congress repeatedly adopted Commerce's position that "countervailing

duties cannot be imposed on NME exports."  *See GPX V*, 666 F.3d at 737.

Importantly, this court's opinion in *GPX V* rested on more than the statute

precluding the application of the CVD law to NMEs.  Rather, looking back at its

previous opinion in *Georgetown Steel*, the court reiterated that "the 'economic

incentives and benefits' provided by governments in NME countries 'do not

constitute bounties or grants under section 303,' that is, 'countervailable subsidies'

in the language of the current statute."  *Id.* at 738 (citations omitted).  In sum, in

*Georgetown Steel* and again in *GPX V* this court viewed the practices at play

within NMEs as fundamentally distinct from subsidies, and confirmed that the statute could not apply or reasonably be expected to apply to such practices.

Congress may now define practices within NMEs to be subsidies, but that fundamental change is not the result of any logical extension of prior law or understanding of the activities to which that law applied or potentially applied. It is not simply a matter of the degree of taxation, as it might be in the case of a retroactive amendment in income tax rates. Practices in NMEs were not known to be potentially taxable under the old CVD law because subsidies simply did not exist in NMEs. *Georgetown Steel*, 801 F.2d at 1315-16. Practices in NMEs became taxable under the CVD law only because Congress recently changed what is contemplated under the law.

The Trade Court in *GPX VII* did not appreciate this distinction. It concluded the change in the CVD law was more akin to a modification in tax policy like that seen in *Carlton* rather than "taxing a type of activity thought to be wholly exempt from the scope of taxation when undertaken . . . ." *GPX VII*, 893 F. Supp. 2d at 1315. The Trade Court's error was in viewing the "modification" in terms of the simple inclusion of NMEs under the CVD law. That analysis assumes the very fact precluded by then existing law. By definition subsidies did not exist in NMEs. The March 2012 Act thus is properly understood to introduce a wholly new tax and

26

may not be applied retroactively without violating due process rights protected by the Fifth Amendment.

Second, the new legislation fails the Supreme Court's notice and consequence analysis. Importers and exporters had no notice of Congress' intent to extend the CVD law to NME imports more than five years before Congress acted. The congressional "debate" that transpired took place years after the implicated import entries had been made. Allowing Commerce's own unlawful actions in prosecuting NME CVD cases under then current law to serve as constructive notice of Congress' subsequent and sudden legislation years in the future would eviscerate any notion of certainty or just and fair treatment under the law. Importers and exporters were entitled to take informed (and correct) positions under the law without triggering implied notice that Congress would pull the rug out from under them in the middle of the night.

The Trade Court in *GPX VII* also distorted this analysis by viewing notice too broadly. According to the Trade Court, "those with goods that may be imported rarely can predict with accuracy what the duty will be." *GPX VII*, 893 F. Supp. 2d at 1313. But this says nothing about the components of the duty or how they may arise. It may be true that NME AD methodology is unpredictable, *id.* at 1314, but this unpredictability has nothing to do with countervailing duties.

Moreover, the Trade Court's finding that the identification and measure of subsidies may also be unpredictable, *see id.*, is equally irrelevant. It says nothing about whether the retroactive application of the CVD law in this instance was predictable. By definition it could not be predicted unless one assumes a party could foretell the future of unprecedented legislative action. The Trade Court's response appears to be that "China's status as a traditional NME was at least unsettled by the time Commerce issued its preliminary determination in this investigation." *Id.* at 1314. The implication is that GPX should have known CVD duties might apply to "non-traditional" NMEs. But that implication is contrary to law, as this court effectively found that only one type of NME existed under the statute and it was not susceptible to countervailing duties. *GPX V*, 666 F.3d at 737-38. Thus, what the Trade Court appears to be saying is that GPX should have simply yielded to the illegal actions of Commerce despite the terms of an unambiguous statute.

Lacking any notice or reasonable ability to anticipate congressional action, let alone such extreme retroactivity, importers like GPX reasonably chose courses of action – exporting and entering goods subject to a plainly unlawful Commerce investigation – that definitively left them in a position worse off after Congress acted than had Congress not acted at all. GPX is now liable for duties that would not have applied in the absence of the new legislation. *Cf. Hemme*, 476 U.S. at 571

(no due process violation where retroactive change in tax resulted in no greater tax than the estate would have owed under the old law).

Moreover, the decision to enter the goods was entirely voluntary and constituted transactions not unlike the gifts made before enactment of a taxing statute identified by the Supreme Court in *Welch*. Such transactions are of a kind the importer "might well have refrained from making had {they} anticipated the tax," and therefore "so arbitrary and oppressive as to be a denial of due process." *Welch*, 305 U.S. at 147. This is not a matter of simple receipt of income, where it cannot be assumed that a party "would refuse to receive . . . even if they knew their receipt would later be subject to a new tax or to an increase of an old one." *Id*. at 148.

Third, even if the extension of the CVD law to NMEs is not considered a "wholly new tax," the more than five-year retroactive period provided under Section 1(b) of the new law far exceeds the "modest period of retroactivity" referred to by the Supreme Court in *Carlton*. 512 U.S. at 32. Thus, five years cannot be associated with the "short and limited periods required by the practicalities of producing national legislation," that have customarily governed congressional practice. *Id*. at 33. The retroactive period provided by Section 1(b) of the legislation exceeds the roughly one-year period normally afforded acts of

Congress in a tax context, and therefore "raises serious constitutional questions,"
*id*. at 38, that must lead to the conclusion that it denies fundamental due process
rights under the Constitution.

### 3. Curative intent is an inadequate justification for the March 2012 Act's retroactive effect

In *GPX VII* the Trade Court dismissed this tax jurisprudence. Instead, it
found persuasive the government's notion that Congress sought to correct an
unexpected judicial decision with the changed law and this curative intent was a
sufficient rationale to justify retroactive application of the CVD law to NMEs more
than five years into the past. *See GPX VII*, 893 F. Supp. 2d at 1312-13. There are
significant problems with the court's reasoning.

Curative intent must have limits if rational basis review is to have any
meaning. In the context of legislative defects, this court in considering curative
intent as a rational basis has itself acknowledged that "all legislation in some sense
corrects a perceived deficiency in past legal remedies and standards," *Nations
Bank*, 269 F.3d at 1337 (Fed. Cir. 2001). This statement echoes concerns raised by
Justice O'Connor in her concurrence in *Carlton v. United States*:

> {T}his mode of analysis proves too much. Every law
> touching on an area in which Congress has previously
> legislated can be said to serve the legislative purpose of
> fixing a perceived problem with the prior state of affairs
> – there is no reason to pass a new law, after all, if the
> legislators are satisfied with the old one.

*Carlton*, 512 U.S. at 36 (O'Connor, J., concurring). If Congress could merely claim "curative intent," a standard that is inherently self-fulfilling, rational basis review of retroactive legislation would become a virtual nullity. One must still consider the facts.

To substantiate curative intent as a rational basis for sustaining retroactive legislation one must consider whether any legislative defect existed requiring curative action. If no defect exists, the purported curative intent is illusory and cannot justify the retroactive effect of the legislation. On this threshold issue the Trade Court failed to address and distinguish the facts of GPX's case. In particular, while all three cases cited and discussed by the Trade Court with respect to "curative intent" may arguably involve some form of legislative defect, including *Pension Benefit Guaranty Corp. v. R.A. Gray*, 467 U.S. 717 (1984), *General Motors Corp. v. Romein*, 503 U.S. 181 (1992), and *Canisius v. United States*, 799 F.2d 18 (2d. Cir. 1986), the same cannot be said in this case.

For example, in *R.A. Gray*, the Trade Court itself described the case as dealing with retroactive legislation intended to "{correct} defects in past legislation." *GPX VII*, 893 F. Supp. 2d at 1312. In that case, Congress through retroactive treatment sought to discourage employers from withdrawing from multi-employer pension programs while it considered changes to the Employee

31

Retirement Income Security Act that would create new obligations in those employers. *R.A. Gray* at 723-724. In *Romein*, the Supreme Court upheld retroactive legislation as a rational means "to restore legislative intent of the original law to maintain benefits to certain workers." *GPX VII*, 893 F. Supp. 2d at 1313. Indeed, *Romein* involved an ambiguous 1981 Michigan statute where the judiciary arrived at an unexpected interpretation. *Romein*, 503 U.S. at 183. Finally, in *Canisius*, the Second Circuit upheld a retroactive change in the tax laws where Congress passed legislation validating an IRS tax ruling that had been in effect and consistently applied for twenty years. Congress acted only after the interpretive underpinnings of the IRS ruling were cast into doubt by a Supreme Court opinion that interpreted the same statutory terms at issue in the IRS ruling in a contrary manner. *Canisius*, 799 F.2d at 21.

In contrast, there is no basis for finding a legislative defect in this case for which curative action was required. Long ago this court in *Georgetown Steel* confirmed the limits of the CVD law, including the fact that it did not apply to NMEs. *Georgetown Steel*, 801 F.2d at 1318. If the *Georgetown Steel* opinion represented any form of "surprise interpretation" like that confronted in *Romein* or *Canisius*, one would have expected Congress to swiftly address the situation then. It did not do so. The opposite occurred. Congress affirmatively considered the very issue in light of the *Georgetown Steel* opinion and declined to provide

Commerce with the authority to apply the CVD law to NMEs, confirming that the CVD law did not apply to NMEs. *See GPX V,* 666 F.3d at 740-742. The law was unambiguous, unlike the law considered in *Romein*.

What endured for more than two decades after *Georgetown Steel* and congressional ratification was a consistent Commerce practice finding that the CVD law did not apply to NMEs. The March 2012 Act did not seek to preserve that practice as it did in *Canisius*, where the retroactive change in the statute sought to confirm a longstanding ruling by the IRS. The opposite facts apply here. Nor can one credibly identify a legislative defect as in *R.A. Gray*. Congressional intent was not to discourage imports from NME countries while it considered modifications to the CVD law. Congress was not concerned about importers gaming the system as they watched the debate over the new law unfold as in *R.A. Gray*. There was no opportunity for importers to opt in or out of transactions long since concluded. Rather, congressional intent was clearly fixed on pre-empting this Court's mandate before it issued in *GPX V*. Thus, *R.A. Gray, Romein,* and *Canisius* do not fairly capture the character of the legislative action in this case or the circumstances acted upon by the March 2012 Act. These cases cannot justify the retroactive effect found in the March 2012 Act. There was no defect in the law to cure on retroactive terms.

33

Beyond these "legislative defect" cases, the Trade Court also cited to cases involving "defects in the administration of the law" as grounds for finding a rational basis in the retroactive effect of the March 2012 Act. *GPX VII*, 893 F. Supp. 2d at 1312. In particular, the lower court cited to *Graham & Foster v. Goodcell*, 282 U.S. 409 (1931) and *United States v. Heinszen & Co.*, 206 U.S. 370 (1907). *Id*. But reliance on these cases is also flawed. In *Graham & Foster*, the issue concerned a mistaken delay in tax collection that exceeded the statute of limitation in the collection of valid taxes. The delay was owed in part to the taxpayers' applications for tax abatement. *Graham & Foster*, 282 U.S. at 418. Through legislation, Congress in very particularized language prohibited a refund of the amount collected. *See id*. at fn. 1 (Sec. 611). In *Heinszen*, the issue concerned the continued collection of import duties by U.S. authorities in the Philippines after a treaty of peace was ratified that withdrew authority for the President to collect such duties. In that case, Congress through legislation explicitly ratified the duty collections at issue. *See Heinszen*, 206 U.S. at 378, 381.

The Trade Court in *GPX VII* found *Graham & Foster* and *Heinszen* illustrative of the "broad deference towards retrospective legislation under an agency theory of law," with the Supreme Court recognizing that "'defects in the administration of the law may be cured by subsequent legislation without encroaching upon constitution right . . . .'" *GPX VII*, 893 F. Supp. 2d at 1312,

quoting *Graham & Foster*, 282 U.S. at 427. But this comment reflects too broad a brush. A more precise characterization was offered by the Supreme Court in *Graham & Foster*, where it indicated that *Heinszen* and similar cases drew distinctions "between a bare attempt of the legislature retroactively to create liabilities for transactions which, fully consummated in the past, are deemed to leave no ground for legislation, and the case of a curative statute aptly designed to remedy mistakes and defects in the administrative of government where the remedy can be applied without injustice." *Graham & Foster*, 282 U.S. at 427. Considering the facts and holdings in cases like *Graham & Foster* and *Heinszen* compared to the facts in this case show that the circumstances of this case represent the "injustice" condemned by *Graham*.

In *Heinszen*, the mistake at issue was the *continued* collection of duties under once valid authority after that authority was stripped by treaty. In the current case, it was Commerce's *change* in practice *against* the unambiguous terms of the statute that precipitated the new law. Similarly, in *Graham & Foster*, the taxes assessed were in fact valid, only the tax collection authority's understanding of the statute of limitations was at fault, with this mistake brought on by the taxpayer's own application for abatement. In the current case, CVD duties were never valid based on the unambiguous terms of the statute. Thus, the balance of equities are demonstrably different. The facts in this case are not equivalent to *Graham &*

35

*Foster* and *Heinszen*, where the Supreme Court permitted congressional ratification of prior acts where "the asserted vested right, *not being linked to any substantial equity*, arises from the mistake of officers purporting to administer the law in the name of the government . . . ." *Graham & Foster*, 282 U.S. at 429 (emphasis added). The equities are quite different and more analogous to those considered in *Forbes Pioneer Boat Line v. Board of Commissioners*, 258 U.S. 338 (1922), which distinguished *Heinszen*. In that case, a suit was brought to recover tolls unlawfully collected. Authority to collect such tolls never existed, much like the circumstances in the present case. The Supreme Court rejected the analogy to *Heinszen*, finding retroactive legislation validating the collected tolls unconstitutional, and stating that "{w}e must assume that the plaintiff went through the canal relying upon its legal rights, and it is not to be deprived of them because the legislature forgot." *Id.* at 340. Thus, like the cases involving legislative defect, the factual distinctions found in these cases undercut their applicability here.

As important, in *Heinszen* the Court held that Congress may "ratify" prior invalid collections of duties, thereby making them valid; the Court did not say that Congress could retroactively impose duties. *Heinszen*, 206 U.S. at 385. The implication in *Heinszen* is that, had the legislation been deemed a retroactive statement of liability, the outcome would have been very different. The Court took

36

note of the explicit terms of ratification found in the legislation, where Congress "hereby legalized and ratified" the past collection of duties "as fully to all intents and purposes if the same had, by prior act of Congress, been specifically authorized and directed."  *Heinszen*, 206 U.S. at 381, quoting 34 Stat. 636 (1906). The same distinction between congressional ratification and retroactive legislation is seen in *Graham & Foster*, which applied *Heinszen*, as well as other cases.  *See*, *e.g.*, *Rafferty v. Smith, Bell & Co., Ltd.*, 257 U.S. 226, 232 (1921) ("The taxes imposed . . . are legalized and ratified . . . .") and *MacLeod v. United States*, 229 U.S. 416, 434-35 (1913) ("The act has the scope given to it in the case of *United States v. Heinszen*, 206 U. S. 370 – namely, to ratify 'the collection of the duties levied under the order of the President' . . . .").  The legislative language seen in these cases is very different from that found in the March 2012 Act, which merely establishes an effective date in the past without any specific ratification of past acts.

## B.    GPX Has A Vested Right In Its CVD Deposits

In its decision the Trade Court noted that "there is no right to import."  *GPX VII*, 893 F. Supp. 2d at 1313.  That may be; but such fact does not refute that Plaintiff GPX has a vested interest in its CVD cash deposits given to the government.

Specifically, GPX agrees that no one has a vested right to trade with foreign nations. *See United States v. Yoshida International, Inc.*, 526 F.2d 560, 580, 63 C.C.P.A. 15 (Cust. Ct. 1975). GPX can also agree that no one has a vested right in the maintenance of an existing rate of duty at the time of importation. *See North American Trading Corporate v. United States*, 783 F.2d 1031, 1032 (Fed. Cir. 1986), *citing Norwegian Nitrogen Products Co. v. United States*, 288 U.S. 294, 318 (1933). Indeed, this court has well noted the absence of a constitutional right in relation to various aspects of international trade, whether it be Congress' power to exclude or restrain imported articles or its power to impose other terms and duties. *See Arjay Associates Inc. v. United States*, 891 F.2d 894, 896-897 (Fed. Cir. 1989). GPX does not contest this jurisprudence. But this court has never found that where facts intersect with international trade no vested interest can ever emerge.

Where the prevailing jurisprudence on international trade and due process departs from the facts of GPX's case is in the long period of retroactivity at play. GPX is not arguing about the fate of current or even future interests in imports. The GPX entries at issue are those made several years before the retroactive change in the law. Although GPX may have had no vested interest in the duty levels that prevailed or could prevail at the time those entries were made, at some point its interests in a particular rate of duty must vest. In an ordinary context,

those interests would normally vest at liquidation when duties are definitively assessed. *Cf. North American Foreign Trading*, 783 F. 2d at 1032 (finding no retroactive imposition of a duty because the goods in question had not been finally liquidated). In this context, the statute provides that entries are normally deemed liquidated within one year of the date of entry unless liquidation is suspended. 19 U.S.C. § 1504. GPX recognizes that its entries were initially suspended as a result of the AD and CVD administrative proceedings to which its entries were subject. But the continued suspension of liquidation in this case is the direct consequence of GPX challenging the legal authority to impose CVDs on its entries in the first instance.

There would have been automatic liquidation of the GPX entries shortly after the first anniversary month of the AD/CVD orders (September 2009). That liquidation did not occur is because of GPX's decision to participate in the first administrative review of the orders to preserve its right to appear in court to contest the illegal collection of CVDs. As a matter of equity, GPX's rights should be deemed vested in September 2009.

It would be a grave injustice to deem GPX lacked any vested interest in duty deposits collected in the absence of any statutory authority by applying a rigid liquidation standard for determining when its interests vested. That approach

would place GPX in the unreasonable position of having forfeited its interests

because it took the very measures prescribed under the law intended to preserve its

interests.  Moreover, it cannot be said that GPX's interests never vested because

the level of CVDs that may apply was unknown at entry.  To the contrary, the issue

is not the level of CVDs that may apply.  Under the unambiguous terms of the

statute <u>no</u> CVDs could apply.  Thus, GPX in fact could quantify its interest in CVD

deposits.  It owed none and therefore was entitled to all that were collected.  Given

these facts, GPX must be found to have a vested right.

## II.    SECTION 1(b) OF THE MARCH 2012 ACT VIOLATES THE *EX POST FACTO* CLAUSE OF THE CONSTITUTION

### A.    The Constitution Prohibits The Retroactive Application Of Penal Legislation

Article I, Section 9 of the Constitution expressly prohibits Congress from

enacting *ex post facto* laws, a prohibition against retroactive legislation that is

"deeply rooted" in American jurisprudence.  *Landgraf v. USI Film Products*, 511

U.S. 244, 265 (1994).  The Supreme Court has held that the prohibition does not

apply to all civil laws, but only to those that retroactively impose new or additional

punishment.  *Eastern Enterprises v. Apfel,* 524 U.S. 498, 533 (1998) ("the *Ex Post

Facto* Clause is directed at the retroactivity of penal legislation . . . ."); *Landgraf*,

511 U.S. at 266 ("The *Ex Post Facto* Clause flatly prohibits retroactive application

of penal legislation.")

In examining whether civil legislation violated the *Ex Post Facto* Clause, the

Supreme Court has emphasized the penal or punitive nature of the legislation.

Thus, in *Cummings v. Missouri*, 71 U.S. 277 (1868), the Court stressed that the law

in question imposed "a punishment for an act not punishable at the time it was

committed." *Id.* at 327-28. Additionally, the Court noted that the law imposed

"additional punishment to that prescribed when the act was committed." *Id.* at

328. The Court took this test – whether the legislation made an act punishable that

was not punishable at the time it was committed, or whether it increased

punishment beyond that which applied when the act was committed – directly from

one of its earliest cases on *ex post facto* laws, *Calder v. Bull*, 3 U.S. 386 (1798). In

*Calder*, the Court stated that *ex post facto* laws include laws, among others, that

either (1) punish an action "which was innocent when done," or (2) that "inflicts a

greater punishment" than that which applied when the act was committed. *Id.* at

390.

The Supreme Court has also determined that legislation singling out a group

or category of people for punishment manifests a penal intent that, when applied

retroactively, may constitute a violation of the *Ex Post Facto* Clause. In *Flemming*

*v. Nestor*, 363 U.S. 603 (1960), for example, the Court reviewed a statute that

retroactively terminated social security benefits for certain categories of

individuals.  The Court summarized its prior cases as relying heavily on a finding of punitive intent behind the challenged legislation.  *Id.* at 615.

In short, the Court has found that legislation that imposes a penalty retroactively may violate the *Ex Post Facto* Clause even though it is not specifically a criminal statute.  The penal nature of the law may be determined by the nature of the punishment imposed – imposing a new punishment or increasing punishment retroactively – or in the penal intent of the legislation as manifest in the singling out of a group for its conduct.  The legislation now before this court falls squarely within the definition of penal or punitive legislation as understood in this context.

B.  **When Congress Passed The March 2012 Act Applying The Countervailing Duty Law To Non-Market Economies Retroactively, Congress Applied A New Penalty To Conduct That Was Not Punishable At The Time It Was Committed**

In passing the March 2012 Act applying the CVD law to NME countries for the first time, Congress made punishable conduct that had not previously been punishable.  In *GPX V*, this court held that the CVD law did not apply to NME countries, and that Congress had agreed that the law did not apply to NME countries.  *GPX V,* 666 F.3d at 745.  Thus, any Commerce decisions applying the CVD law to NME countries were not authorized by the statute and were thus legally improper.

There is also no doubt that when Congress passed the March 2012 Act applying the CVD law to NME countries, it intended to change the law. This court found that "Congress clearly sought to overrule our decision in GPX" when it made the law applicable to NME countries. *GPX VI*, 678 F.3d at 1311. This court's explicit and unambiguous determination that Congress changed the law retroactively when it passed the March 2012 Act should put to rest any arguments that Defendant-Appellees may now make that the new law is somehow merely a "clarification" of prior practice.

A careful reading of this court's *GPX* decisions shows that such arguments would be untenable. This court's December 2011 *GPX V* decision unambiguously held that Congress had "legislatively ratified" Commerce's earlier reading of the statute that found the CVD law inapplicable to NME countries, and explicitly stated that "countervailing duties cannot be applied to goods from NME countries." *GPX V,* 666 F.3d at 745. This legal interpretation of the permissible scope of the old law necessarily meant that all determinations in which Commerce had applied the CVD law to NME countries prior to the court's decision were invalid and contrary to law. In *GPX VI*, this court noted that the March 2012 Act "clearly sought to overrule our decision in *GPX*." *GPX VI,* 678 F.3d at 1311. There is no way that Congress' "overruling" of the Court's GPX decision could be anything other than a change in the law, since it reversed a judicial decision that

explicitly enunciated the scope of the law.  "Clarifying" a judicial decision is not a proper congressional function in our constitutional system.  Rather, courts interpret the law and Congress – if it wishes – can then change the law.  This court's *GPX VI* decision leaves no doubt that the March 2012 Act changed the law as enunciated by this court, and that it did so retroactively to November 20, 2006.

### C.    The March 2012 Act Imposed A Retroactive Penalty On Importers And Exporters From NME Countries And Thus Violated The Ex Post Facto Clause Of The Constitution

As noted previously, the Supreme Court's decisions make clear that a law can violate the *Ex Post Facto* Clause whenever it imposes a new or increased penalty retroactively.  *Cummings*, 71 U.S. at 288; *Calder*, 3 U.S. at 390.  The punitive nature of the law can be seen especially when it retroactively targets a particular group with the penalty.  *Flemming*, 363 U.S. at 605.  The relevant question for inquiry is whether the law imposes a retroactive *penalty* on the individual or group being targeted by the law.  To answer this question, it is first necessary to determine what is meant by a "penalty" or penal legislation.

Fortunately, this court has come up with a succinct and workable test, drawn from the Supreme Court's constitutional law jurisprudence and applied in a trade remedy context, to determine whether a law imposes a penalty.  In *Huaiyin*, this court stated that "a statute imposes a penalty only when":

> (1) the costs imposed are unrelated to the amount of actual harm suffered and are related more to the penalized party's conduct, (2) the proceeds from the infractions are collected by the state, rather than paid to the individual harmed, and (3) the statute is meant to address a harm to the public, as opposed to remedying a harm to an individual.

322 F.3d at 1380, citing *Ingalls Shipbuilding, Inc. v. Dalton*, 119 F.3d 972, 978 (Fed. Cir. 1997). Although the court in *Huaiyin* did not find the specific statutory provision under review to confer a penalty, the court's test remains a useful standard for determining whether a statute is essentially penal in nature.

Although this court's test as enunciated in *Huaiyin* did not specifically consider a claim of a violation of the *Ex Post Facto* Clause of the Constitution, the court's test in fact addresses the same questions raised by the Supreme Court in its jurisprudence on the *Ex Post Facto* Clause. Thus, the first prong of the test, whether the action is related more to the amount of harm suffered or the penalized party's conduct, essentially asks whether the statute imposes a new or additional penalty, as the Supreme Court found in *Cummings v. Missouri*. This prong of the court's test is also useful to determine whether the legislation is targeting a particular group, the question raised by the Supreme Court in *Flemming v. Nestor*. The third prong of the test, whether the statute addresses harm to the public or to an individual, is similar to the Court's question whether the statute makes punishable conduct that was not previously punishable or increases the penalty

45

beyond what it was prior to the legislation. By looking to whether the statute involved is penal in nature, the court's test in *Huaiyin* essentially asks whether it is punitive in such a way as to run afoul of the *Ex Post Facto* Clause if it is retroactively applied. Applying the *Huaiyin* test, it is clear that the March 2012 Act violates the *Ex Post Facto* Clause of the Constitution.

### D. The First Prong of the *Huaiyin* Test Is Met Because The Act Imposes Penalties That Are Unrelated To The Actual Harm Suffered

#### 1. The March 2012 Act imposes additional penalties beyond what could legally have been imposed for cases undertaken before 2012

As noted, the state of the law prior to March 2012, as enunciated in this court's December 2011 *GPX* decision, was that the CVD law did not apply to NME countries. Under the court's ruling, any application of CVDs to those countries was contrary to law. Section 1(b) of the March 2012 Act, however, made the CVD law applicable to all proceedings initiated against NME countries on or after November 20, 2006. Thus, Congress retroactively applied CVDs to proceedings that were not legally subject to such duties at the time the cases were initiated or in process. Moreover, section 2(a) of the March 2012 Act did not apply the "offset" of CVDs against AD duty margins found before March 2012, even though it applied the offset to determinations made after March 2012. In two respects, therefore, the March 2012 Act clearly imposed "a greater punishment"

than legally applied when the pre-2012 proceedings were initiated or were underway. *Calder*, 3 U.S at 390.

This court's decision in *Huaiyin* holds that a retroactive statute may be a penalty if it imposes costs that "are unrelated to the actual amount of actual harm suffered." Here, the additional duties required by sections 1(b) and 2(a) of the March 2012 Act are unrelated to the amount of harm suffered – they go beyond the duties necessary to remedy any harm from the low priced imports from a NME country, and are thus "unrelated" to that harm. They are unrelated to that harm in two distinct respects: (1) the duties are excessive, and (2) the duties are improperly tainted by flawed injury determinations.

First, the duties are excessive. Under the old law, the special NME AD duties were the exclusive and complete measure to address low-priced imports from NME countries. As noted by the Trade Court, the methodological approach under the NME AD provisions mean that "Commerce reasonably can do all of its remedying though the NME AD statute, as it likely accounts for any competitive advantages the exporter received that are measurable." *GPX II*, 645 F. Supp. at 1243. Under the March 2012 Act, Congress changed the law to allows both special NME AD duties as well as CVDs, *but only to the extent* the special NME AD duties have been reduced by the amount of any double counting of the remedy.

47

Consequently, under Congress' own logic reflected in the March 2012 Act, imposing duties that went beyond the combination of CVDs and *adjusted* NME AD duties would no longer be proportional; the duties would no longer be related to the harm, and would instead exceed the underlying harm being addressed.

The fact that the countervailing and antidumping duties imposed by the March 2012 Act are inherently and likely higher than would otherwise have been the case for proceedings between 2006 and 2012 demonstrates the penal nature of the Act, as can be seen from this court's rationale in *Huaiyin*. In *Huaiyin*, this court considered whether the Continued Dumping and Subsidy Offset Act of 2000 (the "Byrd Amendment"), which permitted domestic industries to receive duties collected in antidumping duty proceedings, effectively "converted" the antidumping statute into a "penal" one. 322 F.3d at 1379. In that case, it was critical to the court's determination that the Byrd Amendment did not impose any additional AD duties on the exporters and importers; the proportional relationship between the harm caused by the low prices and the measures in response was not in any way disturbed by the change in law. *Id.* at 1380. If the court had instead considered a case where the retroactive application of the law had resulted in greater AD duties than would have been the case without the law, the court's decision could well have been quite different.

Here, the March 2012 Act retroactively imposes what are likely <u>greater</u>
combined duties than could legally have been applied.  The duties are higher than
could have been imposed under the old law – the March 2012 Act authorizes for
the first time CVD measures not allowed at all under the old law.  The duties are
also higher than can be imposed under the new law prospectively – the March
2012 Act authorizes full special NME AD duties retroactively, rather than the
lower special NME AD duties allowed prospectively (lower to reflect any offset
for duplicative remedies).  These higher duties apply to cases instituted between
2006 and 2012.  The "proportionality" between the offsetting CVD and AD duties
and the underlying harm of lower prices in each of those individual cases was thus
shattered when the March 2012 Act retroactively authorized the application of
CVDs during a period when <u>full</u> special NME AD duties were already being
imposed, and no offset for double counting was allowed.

It bears emphasis that the penalties imposed by the March 2012 Act are
disproportionate to the harm suffered because under the law in effect prior to the
new legislation the application of the NME AD methodology completely addressed
the harm inflicted by low priced imports from non-market economies.  As this
court noted in *Georgetown Steel*, in NME proceedings prior to 2012 "Congress,
however has decided that the proper method for protecting the American market
against selling by nonmarket economies at unreasonably low prices is through the

antidumping law." 801 F.2d at 1318. That is, the NME provisions of the AD law were the exclusive remedy for this harm from low prices from NME countries. The court added, "there is no indication in any of those statutes, or their legislative history, that Congress intended or understood that the CVD law would <u>also</u> apply." *Id*. at 1316 (emphasis added). The special NME AD rules exclusively and completely addressed the problem.

Thus, the state of the law prior to 2012 was that the NME provisions of the antidumping law completely counteracted "the actual harm suffered" by the domestic industry as a result of "unfair" low priced exports from NME countries. The "costs imposed" on exporters from NME countries as a result of antidumping duties were thus proportional to the injury suffered by the domestic industry. The March 2012 Act, however, imposed an additional cost by allowing CVDs to be applied to cases initiated before 2012, thus adding an additional burden beyond that which was necessary to offset any harm from the unfairly low prices.

The second respect in which the additional duties required by Sections 1(b) and 2(a) of the March 2012 Act are unrelated to the amount of the harm suffered relates to the relationship between the duties imposed and the injury finding by the ITC. The ITC, which makes the determination of material injury, must evaluate, among other factors, "the magnitude of the margin of dumping" in making its

50

determination of injury. 19 U.S.C. § 1677(7)(C)(iii)(V). Moreover, in determining the question of threat of injury, the ITC is also required to evaluate the "nature of the countervailable subsidy" and the "effects likely to be caused by the countervailable subsidy." 19 U.S.C. § 1677(7)(E)(i).

Although the ITC is not required by law to calculate the precise impact of the margin of dumping or the countervailable subsidy in its injury determination, the statute still requires the ITC to take AD and CVD margins into consideration in making its decision. And the ITC has never stated that the extent of the AD or CVD margins plays no role in its decision. Thus, although the ITC has full discretion to determine how much weight it will give to the margins of dumping or subsidies, since the ITC is required to give them some consideration it is only logical that the imposition of a higher AD or CVD margin would have some effect on the ITC's finding of injury or threat of injury.

The March 2012 Act, however, imposed additional countervailing and antidumping duties retroactively on cases initiated between November 20, 2006 and March 13, 2012 without *any* provision for the ITC to reconsider its injury determinations. The ITC must make any future injury determinations based on lower NME AD margins – lower margins that reflect the offset for any double counting. But these prior injury determinations rest on a fundamentally flawed

foundation.  By considering the full NME AD margins <u>and</u> the full CVD margins, the ITC's decisions in those cases was skewed toward an affirmative determination.

This AD duty distortion applies in all the prior cases.  In many of the prior cases – including this case – there is further distortion on the subsidy side.  For its <u>threat</u> of injury analysis, the ITC must also consider the nature and extent of countervailable subsidies.  *See* 19 U.S.C. § 1677(7)(F).  Under the old law, no CVD would have been allowed at all.  Yet the ITC considered these impermissible CVD margins as part of its justification for making an affirmative determination.  These injury determinations thus rest on a flawed factual foundation, and the ensuring trade remedy orders are thus legally flawed and improper.

This distortion is compounded by the fact that in sunset reviews, under current law, Commerce always utilizes the AD and CVD margins from the original investigation as the "likely" AD and CVD margins that will exist upon revocation, and the ITC must accept these Commerce findings in its own sunset analysis.  *See* 19 U.S.C. § 1675a; *Policies Regarding the Conduct of Five-year (``Sunset'') Reviews of Antidumping and Countervailing Duty Orders; Policy Bulletin* (Policy Bulletin 98-3), 63 Fed. Reg. 18,871 (Dep't Commerce April 16, 1998).  Thus, the

improper and disproportional high margins imposed retroactively will also skew future sunset determinations by the ITC.

In both of these respects, the law therefore imposes a punishment upon foreign exporters and importers that is completely unrelated to any "actual injury" that might or might not have been caused by the low-priced subsidized or dumped imports. By definition, the proportional relationship between the harm of low prices that cause injury and special NME AD measures alone cannot be the same as the proportional relationship between that injury and special NME AD measures plus additional CVD measures. Thus, the March 2012 Act eliminated the proportionality that previously existed between the conduct penalized and the injury found.

Moreover, even if one believes Congress needed to allow CVD measures to capture something not already being captured by the special NME AD measures, the retroactive duties under the March 2012 Act are still not proportional. Unlike the prospective duties, the retrospective duties are not reduced by the offset for double counting. There is no proportional mathematical link. Rather, the retroactive duties go further than necessary, and thus shatter any proportionality. The retroactive duties become a penalty.

### 2. The retroactive application of the CVD law was intended as a punishment for Chinese exporters

The complete first prong of the test for a penal statute, as set forth by this court in *Huaiyin*, is whether "the costs imposed are unrelated to the amount of actual harm suffered *and are related more to the penalized party's conduct.*" 322 F.3d at 1380 (emphasis added). In the case of the March 2012 Act, the costs imposed are both unrelated to the actual amount of the harm suffered and instead are related more to the penalized party's conduct. During the 32-minute House debate on the Act, several members of Congress rose to make clear that the intent of the legislation was to punish China for what Congress perceived as its illegal conduct. Although one member of Congress did suggest a remedial purpose of the legislation, three others condemned China's "illegal" subsidies.[2] It is thus clear that Congress intended the March 2012 Act in general, including its retroactive provisions, as a measure to punish China for its conduct in granting "illegal" subsidies. If that was not the sole purpose of the legislation, it is at least certain that Congress intended the Act "more" as a punitive measure than as a remedy for harm done.

---

[2] 158 Cong. Rec. H1169-H1170 (statements of Representatives Pascrell, Michaud and Slaughter). In comparison, only one Congressman, Mr. Ellmers, even mentioned that the duties "merely serve as a correction to unfair Chinese subsidies."

That Congress sought to punish China (and those companies benefiting) for providing "illegal subsidies" is also apparent from the lack of relationship between the penalty imposed and the harm suffered as previously discussed.  By making the CVD law newly applicable to NME countries in addition to the already existing NME AD rules that were already remedying the unfairly low prices, Congress explicitly singled out a category of actors – the Chinese government and Chinese exporters – and applied to them a penalty over and above what was necessary to remedy the conduct in question.  Thus, Congress' punitive intent can be seen not only in the statements made on the floor of the House but also in the penalty imposed by the March 2012 legislation itself.

> **3.    The general "remedial" nature of the countervailing duty and antidumping laws has nothing to do with whether the particular retroactive application in the March 2012 Act is punitive**

The court below stated that the retroactive application of the CVD law to cases between 2006 and 2012 cannot be a penalty because the CVD laws have been recognized as serving a "remedial purpose."  *GPX VII*, 893 F. Supp. at 1309.  This statement misses the point.  The question is not whether the CVD and AD laws in general are remedial or punitive.  To paraphrase the court's language in *Huaiyin*, the retroactive application of the CVD law to cases where that law should

not have applied converted the CVD law from a remedial statute into a penal one. *See* 322 F.3d at 1379-80.

In sum, the March 2012 Act imposed a penalty that was not related to the harm suffered and instead served to punish Chinese exporters.  The fact that the CVD and AD laws in general are remedial in nature has nothing to do with the specific provision of the March 2012 Act, which was manifestly punitive in nature and intent.  The March 2012 Act satisfies the first prong of this court's test as set forth in *Huaiyin*.

> **E.    The Second Prong of Proceeds of the *Huaiyin* Test Is Met Because Proceeds From The Retroactive Application Of Countervailing Duties Are Collected By The Federal Government**

The second prong of the test enunciated in *Huaiyin*, whether "the proceeds from the infractions are collected by the state, rather than paid to the individual harmed," is also satisfied by the March 2012 Act.  As the court noted in *Huaiyin*, duties collected by the AD and CVD statutes are "deposited with the Treasury for general purposes."  Under the Byrd Amendment, dumping duties in some cases were paid to the domestic industry, a fact that made the retroactive application of that law look less like "a fine payable to the government, and look more like compensation to victims of anticompetitive behaviors."  *Huaiyin*, 322 F.3d at 1380.  Here, by contrast, none of the CVDs retroactively authorized by the March 2012 legislation have ever gone to any "victims of anticompetitive behaviors;" all these

duties went directly to the Treasury's general revenues.[3]  The additional duties imposed retroactively by the March 2012 legislation therefore meet the second prong of the *Huaiyin* test.

> **F.    The Third Prong of Proceeds of the *Huaiyin* Test Is Met Because The Retroactive Application Of The CVD Law Was Intended To Address A Harm To The Public, Rather Than Remedying A Harm To An Individual**

The third prong of the court's test is whether the statute was intended to address a perceived harm to the public or remedy a <u>specific</u> harm to an individual. If the March 2012 Act was an attempt to remedy only the harm to an individual, one would expect the Act to prevent any double-counting of duties that might occur when AD and CVDs are applied on the same product from the same NME country.  The March 2012 Act itself concedes that the danger of double-counting may exist, since for cases initiated after March 2012 section 2(a) of the legislation provides for Commerce to calculate an "offset" in antidumping duties:  a reduction of those duties to the extent that it can be shown that the imposition of CVDs already compensates for an element of subsidy in the price of the product.  To remedy the harm to the individual requires only the imposition of duties once; it does not require double duties.  Thus, for cases initiated after March 13, 2012, the

---

[3]  In its decision in *GPX VII*, the Court of International Trade seemed to agree that the second prong of *Huaiyin* was met by the statute, saying that plaintiffs in that case had failed to prove "prong one and prong three of the *Huaiyin* test.  893 F. Supp. 2d at 1310.

penalty imposed is limited to the harm caused to individuals from the unfairly low prices.

Section 2(a), however, does not apply to cases initiated between November 20, 2006 and March 13, 2012.  By refusing to apply the offset for double counting retroactively, the very calibration between cost and individual injury that the new law itself imposes for cases initiated after March 13, 2012 is refused for cases initiated before this date.  It is apparent, then, that the retroactive application of section 1(b) of the March 2012 Act, coupled with the lack of retroactivity in section 2(a), must have been intended to address a more general public harm rather than any specific individual harm.  These duplicative duties do not offset harm from lower prices. They go beyond merely offsetting unfairly low prices, and instead seek to make a broader statement for some broader public purpose.

The imposition of CVD measures in addition to already high special NME AD measures confirms the March 2012 Act addresses a general public harm.  This particular case presents a rather compelling concrete example, with a nearly 30 percent special NME AD measure that has essentially eliminated all imports from China.  With high AD measures eliminating any competition from Chinese imports, it is hard to see how any additional duties can possibly be addressing any

specific harm to those individual industries from low Chinese prices. The additional CVD measures must be serving some broader public objective.

This focus on broader public harms can also be seen from the congressional statements on the floor of the House. These statements show a concern to punish China for its "public" harm, precisely the characteristic of a penal statute. There may also have been some concern to avoid taking action that could be perceived as in anyway benefiting China or those who deal in goods from China. Whatever the specific reason – which is hard to discern from the sparse legislative history of the March 2012 Act – the reason goes beyond merely offsetting the unfairly low prices and addressing the individual harm.

In sum, the March 2012 Act meets all three prongs of the *Huayin* test this court has adopted to determine whether a statue is penal or not. For actions commenced prior to March 2012, the March 2012 Act applies a penalty that is greater than that which applies after March 13, 2012. This is precisely the type of law that the Supreme Court has held to constitute an *ex post facto* law in violation of the Constitution.

III.  **BECAUSE THE NEW CVD LAW CANNOT BE APPLIED
RETROACTIVELY, SECTION 1(B) MUST BE SEVERED FROM
THE LEGISLATION AND THE CVD ORDER MUST BE
TERMINATED**

Because section 1(b) of the new law is unconstitutional, it should be severed

from the remainder of the March 2012 Act to preserve the broader legislation.  The

general rule of severability is that a federal court should not invalidate more of a

statute than necessary.  *Alaska Airlines v. Brock*, 480 U.S. 678, 684 (1987)

(quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984) (plurality opinion)).  In

2010, the Supreme Court restated the severability doctrine in *Free Enterprise Fund

v. Public Co. Accounting Oversight Board*, 561 U.S. ___, 130 S. Ct. 3138 (2010).

Under step one of the analysis a reviewing court must determine whether all of the

remaining provisions of the statute are still fully functional without the

constitutionally infirm provision.  *Id.* at 3161-62.  If the statute still fully functions,

the reviewing court then considers under a second step whether Congress would

find the remaining statute acceptable.  *Id.*

Applying this test to the statute in question establishes that section 1(b) of

the March 2012 Act, which contains the offending retroactive effective date, may

easily be severed from the remainder of the statute.  First, eliminating the

retroactive effective date found in section 1(b) of the new legislation does not

render the remainder of the statute inoperable.  It merely limits application of the

60

CVD law to NMEs to *prospective* circumstances.  Second, it cannot be said that

Congress would not be satisfied with prospective application, as Congress clearly

intended to provide domestic industries with a new trade remedy.  The fact that the

remedy in question may not be applied retroactively does not nullify the value

Congress placed on that remedy prospectively.  "{N}othing in the statute's text or

historical context makes it 'evident' that Congress, faced with the limitations

imposed by the Constitution, would have preferred" no remedy at all to a remedy

that only applies prospectively.  *Free Enterprise*, 561 U.S. at ___, 130 S. Ct. at

3162.

Severing section 1(b) of the new legislation from the remainder of the March

2012 Act means that CVD remedies can not apply retroactively to NME countries.

Thus, this court must hold unlawful the challenged CVD determination pursuant to

this court's May 2011 *GPX* decision.  Commerce had no authority to impose CVD

duties against NMEs such as China.  Or stated differently, this court's *GPX*

decision governs this case.  It follows that because Commerce had no legal

authority to impose CVD duties against imports from China, this Court must hold

unlawful Commerce's underlying CVD determination and then instruct Commerce

to terminate the CVD order imposed on kitchen shelving and appliance racks from

China.

61

## CONCLUSION AND RECOMMENDED APPELLATE REMEDY

For these reasons, we respectfully request that this court hold: first, that

section 1(b) of the March 2012 Act is unconstitutional; and second, that it is

possible to sever section 1(b) from the remainder of the March 2012 Act, and

therefore Commerce's CVD determination and CVD order are unlawful under this

court's December 2011 *GPX V* decision.


Respectfully submitted,


/s/  Daniel L. Porter


Daniel L. Porter
James P. Durling
Christopher Dunn
Matthew P. McCullough
Ross Bidlingmaier

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 452-7373

Counsel for Plaintiff-Appellants

**ADDENDUM**

Slip Op. 13-132

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **GPX INTERNATIONAL TIRE CORPORATION, and HEBEI STARBRIGHT TIRE CO., LTD.,** | |
| Plaintiffs, | |
| **TIANJIN UNITED TIRE & RUBBER INTERNATIONAL CO., LTD.,** | |
| Consolidated Plaintiff, | |
| v. | **Before: Jane A. Restani, Judge** |
| **UNITED STATES,** | **Consol. Court No. 08-00285** |
| Defendant, | Public Version |
| **BRIDGESTONE AMERICAS, INC., BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC, TITAN TIRE CORPORATION, and UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC,** | |
| Defendant-Intervenors. | |

[Commerce's redetermination in countervailing duty case is sustained.]

## OPINION

Dated: October 30, 2013

William H. Barringer, Daniel L. Porter, James P. Durling, Matthew P. McCullough, and Ross E. Bidlingmaier, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, for the Plaintiffs GPX International Tire Corporation and Hebei Starbright Tire Co., Ltd.

Mark B. Lehnardt, Lehnardt & Lehnardt, LLC, of Liberty, MO, argued for Consolidated Plaintiff Tianjin United Tire & Rubber International Co., Ltd.

Alexander V. Sverdlov, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for the Defendant.  With him on the brief were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Franklin E. White, Jr., Assistant Director, Loren M. Preheim, Trial Attorney, and John J. Todor, Trial Attorney.  Of counsel on the brief were Daniel J. Calhoun and Matthew D. Walden, Attorneys, U.S. Department of Commerce, of Washington, DC.

Elizabeth J. Drake, Stewart and Stewart, of Washington, DC, argued for the Defendant-Intervenors Titan Tire Corporation and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC.   With her on the brief were Terence P. Stewart, Geert M. De Prest, William A. Fennel, Eric P. Salonen, and Wesley K. Caine.

Joseph W. Dorn, J. Michael Taylor, Daniel L. Schneiderman, Jeffrey M. Telep, Kevin M. Dinan, Prentiss L. Smith, and Christopher T. Cloutier, King & Spalding, LLP, of Washington, DC, for Defendant-Intervenors Bridgestone Americas Tire Operations, LLC and Bridgestone Americas, Inc.

Restani, Judge: This matter is before the court following a remand to the

Department of Commerce ("Commerce") in GPX Int'l Tire Corp. v. United States, 893 F. Supp.

2d 1296 (CIT 2013) ("GPX VII").  Plaintiffs GPX International Tire Corporation ("GPX") and

Hebei Starbright Tire Co., Ltd. ("Starbright"),[1] Consolidated Plaintiff Tianjin United Tire &

Rubber International Co., Ltd. ("TUTRIC"),  and Defendant-Intervenors Titan Tire Corporation

and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy Allied Industrial and

Service Workers International Union, AFL-CIO-CLC (collectively, "Titan") challenge various

aspects of the Final Results of Redetermination Pursuant to Remand, ECF No. 394 ("Remand

Results").  For the reasons set forth below, Commerce's Remand Results are sustained.

## BACKGROUND

The court assumes familiarity with the facts of this case as set out in the previous

---

[1] Starbright is a fully owned subsidiary of GPX.  Resp't Pl.'s App. - Confidential, Tab 12, Ex. B at 2.  At times throughout this opinion, the names of the two companies are used interchangeably where a distinction is unimportant.

opinions.  See generally GPX VII, 893 F. Supp. 2d at 1318–34.  For ease of understanding,

however, a brief summary is provided below.

        This case involves challenges to Commerce's final determination in a

countervailing duty ("CVD") investigation of certain pneumatic off-the-road tires from the

People's Republic of China ("PRC").  See Certain New Pneumatic Off-the-Road Tires from the

People's Republic of China: Final Affirmative Countervailing Duty Determination and Final

Negative Determination of Critical Circumstances, 73 Fed. Reg. 40,480 (Dep't Commerce July

15, 2008); see also Issues and Decision Memorandum for the Final Affirmative Countervailing

Duty Determination: Certain New Pneumatic Off-the-Road Tires (OTR Tires) from the People's

Republic of China, C-570-913, POI: 1/01/06–12/30/06 (July 7, 2008), available at

http://ia.ita.doc.gov/frn/summary/prc/E8–16154–1.pdf (last visited Oct. 21, 2013) ("I & D

Memo").  In its previous order, the court instructed Commerce to address five issues raised in the

initial rounds of briefing in this matter.  See GPX VII, 893 F. Supp. 2d at 1319–33.  Specifically,

the court ordered Commerce to: 1) re-weigh the evidence related to the arm's-length nature of the

Hebei Tire Co., Ltd. ("Hebei Tire") asset sale; 2) examine the veracity of appraisals proffered by

GPX in determining whether Hebei Tire's assets were sold for fair market value ("FMV");

3) explain its inability to offset any subsidy determined to have been transferred to Starbright by

any amount of the purchase price that reflected payment for the subsidy; 4) explain its loan

benefit calculation and whether Titan's alternative methodology constitutes a legitimate attempt

to avoid a distorted calculation; and 5) consider evidence concerning the transfer of TUTRIC

debt holdings and reduce TUTRIC's benefit calculation by the amount of any payment made by

or on behalf of TUTRIC.  See id.  On remand, Commerce: 1) determined that the sale of Hebei

Tire's assets was not conducted at arm's length; 2) determined that the appraisals proffered by

GPX are unsatisfactory for benchmarking purposes; 3) explained its inability to calculate a

purchase price offset; 4) explained its loan benefit calculation and why it rejected Titan's

alternative; and 5) considered TUTRIC's evidence, continued to find that TUTRIC benefited

from countervailable debt forgiveness, and reduced TUTRIC's benefit calculation as ordered.

See Remand Results at 1–2.[2]

          GPX continues to challenge Commerce's findings concerning the nature of the

Hebei Tire asset sale. Resp't Pl.'s Cmts. on the U.S. Dep't of Commerce's Remand

Redetermination, ECF No. 397 ("GPX Cmts.") 1–9.[3]  Titan argues that Commerce's loan benefit

calculations are unlawful and unsupported by substantial evidence. Cmts. of the Titan Tire Corp.

and the United Steelworkers Union on the Dep't of Commerce's Redetermination Pursuant to

Remand, ECF No. 398 ("Titan Cmts.") 2–7.  Although TUTRIC's rate of countervailing duties

was reduced on remand from 6.85% to 3.93% because the allegedly forgiven debt was partially

repaid, TUTRIC argues that Commerce failed to reasonably consider the evidence concerning its

---

          [2] Commerce indicated that its redetermination was completed under protest, but it failed to specify which aspects of the Remand Results the protest covered. The only legitimate purpose of registering a protest in a remand determination is to preserve a particular issue for appeal where the agency has been compelled to take a particular step that results in an outcome not of its choosing. At oral argument, government counsel conceded that the final TUTRIC determination is the only one that may be so described, i.e. the agency was compelled to consider new determinative facts in valuing the subsidy to TUTRIC. Whether the general expression of disagreement is sufficient to preserve this specific issue for appellate review cannot be decided here. Putting aside appearance issues, specificity would eliminate ambiguity for these purposes.

          [3] Although GPX's rate has been reset by an intervening administrative review, see New Pneumatic Off-the-Road Tires From the People's Republic of China: Final Results of Countervailing Duty Administrative Review, 76 Fed. Reg. 23,286, 23,288 (Dep't Commerce Apr. 26, 2011), this case is relevant to whether countervailing duties are owed at all.

debt financing and that Commerce's determination is contrary to law.  Cmts. on Remand

Redetermination of Tianjin United Tire and Rubber Int'l Co., Ltd., ECF No. 400 ("TUTRIC

Cmts.") 10–19.  Defendant United States responds that Commerce's determinations are

supported by substantial evidence and in accordance with law.  Def.'s Resp. to Cmts. on the

Final Redetermination Pursuant to Ct. Remand, ECF No. 412 ("Def. Cmts.") 10–31.[4]

## JURISDICTION AND STANDARD OF REVIEW

The court has continuing jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court

will not uphold any determination by Commerce that is "unsupported by substantial evidence on

the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B).

## DISCUSSION

### I.      Change in Ownership of Hebei Tire

GPX challenges Commerce's determination on remand that Starbright received

countervailable subsidies when it acquired Hebei Tire's assets in 2006.  GPX Cmts. 1–9.

Defendant argues that Commerce's determination is supported by substantial evidence and in

accordance with law.  Def. Cmts. 10–23.

To find a countervailable subsidy, Commerce is required by statute to identify a

financial contribution given by an authority that conferred a benefit on an entity.  19 U.S.C.

§ 1677(5)(B).  "A change in ownership of all or part of a foreign enterprise or the productive

assets of a foreign enterprise does not by itself require a determination by the administering

authority that a past countervailable subsidy received by the enterprise no longer continues to be

---

[4] Antidumping duty issues were resolved previously.  See generally GPX Int'l Tire Corp.
v. United States, 715 F. Supp. 2d 1337 (CIT 2010).

countervailable, even if the change in ownership is accomplished through an arm's length

transaction." Id. § 1677(5)(F). The statute, however, does not explain under what conditions a

subsidy will be extinguished upon the sale of the subsidized company. As the court discussed in

its previous opinion, Commerce has promulgated a series of regulations attempting to establish a

reasonable methodology for determining whether a purchaser continues to benefit from a

countervailable subsidy given to its predecessor. See GPX VII, 893 F. Supp. 2d at 1321–24.

       Under its current practice, Commerce begins with a baseline presumption that

non-recurring subsidies continue to benefit the recipient for the average useful life of the

recipient's assets. Notice of Final Modification of Agency Practice Under Section 123 of the

Uruguay Round Agreements Act, 68 Fed. Reg. 37,125, 37,127 (Dep't Commerce June 23, 2003)

("Final Modification"). Where a transaction is at arm's length and for fair market value,

Commerce will consider the subsidy extinguished. See id. Commerce first examines whether

the transaction was conducted at arm's length. Id. at 37,127. In so doing, Commerce looks for a

relationship between the parties and whether the seller sought to pursue public interests. Id. at

37,127, 37,130, 37,132–33. Commerce also examines whether the purchaser paid FMV. Id. at

37,127. Under this prong, however, Commerce does not focus on comparing a numerical

estimate of FMV to the purchase price. Id. at 37,131. Instead, Commerce employs a process-

based approach that looks to whether the parties relied on independent evaluations before or

during negotiations to establish a price, whether the sale was sufficiently open to allow for

competitive bidding, whether the sale was awarded to the highest bidder, and whether there were

requirements for future investment.[5] Id. at 37,127. Again, under Commerce's methodology,

both findings are necessary conditions to Commerce finding that the subsidies were extinguished.

Id. at 37,127–28.

        In its previous decision, the court sustained Commerce's initial determination that

_____

        [5] According to the methodology:

        A primary consideration in this regard normally will be whether the government
        failed to maximize its return on what it sold, indicating that the purchaser paid
        less for the company or assets than it otherwise would have had the government
        acted in a manner consistent with the normal sales practices of private,
        commercial sellers in that country.

Final Modification, 68 Fed. Reg. at 37,127.

        To determine whether this condition is satisfied, Commerce has identified a non-
exhaustive list of four considerations:

        (1) Objective analysis: Did the government perform or obtain an objective
        analysis in determining the appropriate sales price? Did it implement the
        recommendations of such objective analysis for maximizing its return on the sale,
        including in regard to the sales price recommended in the analysis?

        (2) Artificial barriers to entry: For example, did the government impose
        restrictions on foreign purchasers or purchasers from other industries, or overly
        burdensome or unreasonable bidder qualification requirements, or any other
        restrictions that artificially suppressed the demand for, or the purchase price of,
        the company?

        (3) Highest bid: For example, was the highest bid accepted and was the price paid
        in cash or close equivalent? Why or why not?

        (4) Committed investment: For example, were there price discounts or other
        inducements in exchange for promises of additional future investment that private
        commercial sellers would not normally seek (e.g., retaining redundant workers or
        unwanted capacity)? Did the committed investment requirements serve as a
        barrier to entry, or in any way distort the value that bidders were willing to pay for
        what was being sold?

Id.

Hebei Tire was not fully privatized at the time of the sale at issue, and therefore Commerce need

not presume that the sale was at arm's length and for FMV. <u>GPX VII</u>, 893 F. Supp. 2d at 1325.

The court concluded, however, that Commerce's arm's-length and FMV analyses required

revisiting. <u>Id.</u> at 1327–28. With respect to the arm's-length analysis, the court held that although

Commerce had reasonably determined that a worker retention agreement and shareholder-

employee side payment attached to the sale could have undermined the arm's length nature of the

transaction, Commerce had adopted a distorted view of the actions of Hebei Tire's chairman in

communicating a pre-negotiated purchase price to the auction house that administered the sale.

<u>See</u> <u>id.</u> at 1325–26. As Commerce's determination that the sale was not conducted at arm's

length rested on its analysis of both the worker retention agreement/payment and the chairman's

actions, the court instructed Commerce to re-weigh the evidence. <u>Id.</u> at 1326. With respect to

the FMV analysis, the court held that although Commerce is entitled to deference in determining

what weight to assign the various components in its process-based methodology, Commerce

cannot completely disregard company appraisals on the record. <u>Id.</u> at 1327. As Commerce had

done so with respect to appraisals proffered by GPX, the court instructed Commerce to examine

the veracity of these appraisals. <u>Id.</u> In view of Commerce's analysis of these issues, the court

sustains Commerce's determination on remand.

A.      <u>Arm's-Length Analysis</u>

        GPX first argues that Commerce's determination as to the arm's-length nature of

the sale is inconsistent with the court's instruction and unsupported by substantial evidence.

GPX Cmts. 1–6. On remand, Commerce determined that the Hebei Tire chairman's actions were

inconsistent with the transaction having been conducted at arm's length and that the worker

retention agreement/payment independently defeated the arm's-length nature of the transaction.

<u>Remand Results</u> 7–10, 37–38.  The latter determination is supported by substantial evidence.

As an initial matter, the court finds that Commerce has maintained a distorted view of the chairman's interaction with the auction house.  In its previous decision, the court found that Commerce had "failed to point to evidence that in setting the reserve price, according to the mandatory auction rules, the chairman somehow acted contrary to Hebei Tire's interest in securing a winning bid, from any buyer, in light of its ongoing foreclosure proceedings." <u>GPX VII</u>, 893 F. Supp. 2d at 1326.  Critically, the court noted that the chairman's actions appeared "consistent with Hebei Tire ensuring that a bid would be made, as well as be accepted, during the auction, as a previous auction had failed to solicit any winning bids." <u>Id.</u>  Nevertheless, Commerce determined on remand that the chairman need not have acted contrary to Hebei Tire's interests for Commerce to find that his actions were inconsistent with the transaction having been conducted at arm's length. <u>Remand Results</u> at 9.  Instead, Commerce determined that its finding was reasonable because the purchase price "embodied the conjoined interests of both buyer and seller." <u>Id.</u>  This position is without merit.

Although an "arm's length transaction" is not defined by statute, the Statement of Administrative Action Accompanying the Uruguay Round Agreements Act ("SAA") defines it for purposes of 19 U.S.C. § 1677(5)(F) as "a transaction negotiated between unrelated parties, each acting in its own interest, or between related parties such that the terms of the transaction are those that would exist if the transaction had been negotiated between unrelated parties."  H.R. Doc. 103-316 (1994), at 928, <u>reprinted in</u> 1994 U.S.C.C.A.N. 4040, at 4241 ("<u>SAA</u>").  The issue, therefore, is whether Hebei Tire's chairman failed to act in his company's interest, not whether

the purchase price reflected the interests of both Starbright and Hebei Tire.[6]  Moreover, it seems

perfectly self-interested that the chairman, having been unsuccessful once before, would take

proactive measures to ensure that the auction house's procedures not stand in the way of the only

sale in sight.  All the chairman advocated for was a lower price floor, not a price ceiling.

Commerce cannot determine reasonably that such efforts to ensure closure of the deal defeat the

arm's-length nature of a transaction.  See Yangzhou Bestpak Gifts & Crafts Co. v. United States,

716 F.3d 1370, 1378 (Fed. Cir. 2013) ("[W]hile various methodologies are permitted by the

statute, it is possible for the application of a particular methodology to be unreasonable in a given

case.  Form should be disregarded for substance and the emphasis should be on economic

reality." (internal quotation marks, citations, and brackets omitted)).

        Despite this error, however, Commerce determined in the alternative that the

arm's length nature of the sale was independently defeated by the worker retention agreement,

combined with the side payment to the shareholder-employees.[7]  Remand Results at 37–38.  The

_____

        [6] Defendant also argues that the chairman's actions were inconsistent with the definition
of "arm's length transaction" provided in the Final Modification.  Def. Cmts. 12.  Defendant
characterizes the Final Modification as defining an arm's-length transaction as "a transaction
where the buyer and seller, as well as their interests, are separate."  Id.  The Final Modification
says no such thing; rather, the Final Modification provides only that Commere "will be guided by
the SAA's definition of an arm's-length transaction."  Final Modification, 68 Fed. Reg. at
37,127.  There is no reason to believe an arm's-length transaction can never occur where interests
overlap in part, such as an interest in finalizing an agreed-upon transaction.

        [7] Commerce repeated its analysis of the worker retention agreement on remand.  Remand
Results at 7–8.  Although GPX seems to acknowledge that the court held Commerce's treatment
of the worker retention agreement to be reasonable in its previous opinion, GPX again argues
that Commerce did not reasonably consider this agreement, perhaps under the view that
Commerce altered its prior analysis on remand.  See GPX Cmts. 2–4.  Defendant rightly asserts
that Commerce merely elaborated on the significance of the agreement, as per the court's
instruction to re-weigh the evidence.  Def. Cmts. 14.  The court declines to revisit this issue.

court found in its previous opinion that Commerce could conclude reasonably that this agreement

created a conflict between the interests of profit maximization and job security such that Hebei

Tire may have been less likely to negotiate for the highest possible price than it otherwise would

have.  GPX VII, 893 F. Supp. 2d at 1326.   With the benefit of this analysis and Commerce's new

determination that this was an independent basis for finding that the transaction was not at arm's

length, the court sustains Commerce's determination that the sale was not conducted at arm's

length.

      B.    <u>FMV Analysis</u>

        GPX also challenges Commerce's FMV analysis.  GPX Cmts. 6–8.  GPX argues

that Commerce failed to reasonably consider the appraisals on the record and that Commerce's

FMV determination is unsupported by substantial evidence.  <u>Id.</u>  Commerce contends at the

outset that because the transaction must be both at arm's length and for FMV, it is unnecessary to

consider one prong if the court finds that the other has not been met.  <u>See</u> <u>Remand Results</u> at 10.

Nonetheless, Commerce determined on remand that the appraisals proffered by GPX, one

commissioned by Starbright and another commissioned by Hebei Tire, are unsatisfactory for

benchmarking FMV.  <u>Id.</u> at 14–18.  As to the Starbright-commissioned appraisal, Commerce

supported its determination with statements in the appraisal attesting to its incomplete and

cursory coverage, as well as with evidence that Hebei Tire's records were poorly managed.[8]  <u>Id.</u>

---

[8] Specifically, Commerce found: that the appraisal states that its coverage is partial; that
the appraisal states as its objective to provide only "a general idea" of the assets' value; that the
appraisal states that off-the-books equipment is excluded from the valuation; that the appraisal
may not have included certain mortgaged equipment; that beyond land use rights, the appraisal
includes no intangible property; and that the appraisal's accuracy turns on the quality of Hebei
Tire's records, which an outside due diligence report on the record found deficient.  <u>Remand</u>
(continued...)

at 15–17.  As to the Hebei Tire-commissioned appraisal, Commerce supported its determination

with evidence concerning the timing and duration of the appraisal, the scope of the appraisal, and

the appraisers' levels of experience, as well as with statements in the appraisal conditioning its

veracity on the quality of Hebei Tire's records.  Id. at 17–18.  GPX contends that Commerce's

determination relies on unreasonable inferences from the evidence.  See GPX Cmts. 6–7.  This

claim is without merit.

   The court turns first to Commerce's assertion that the FMV analysis is rendered

unnecessary by a finding by Commerce that the transaction was not at arm's length or vice versa.

Commerce's position is based on its present methodology that requires both conditions be met.

See Final Modification, 68 Fed. Reg. at 37,127, 37,130.  In adopting its process-based

methodology, Commerce explained that it focuses on the arm's-length nature of the sale as a

means for determining whether FMV was paid: if the transaction was at arm's length, Commerce

presumes FMV was paid.  See id.  Although this presumption is a reasonable interpretation of the

statute, Commerce is precluded from adopting a per se rule that the absence of an arm's-length

transaction always prevents subsidies from being extinguished, regardless of whether FMV is

actually paid, absent some finding of a sham transaction.  Such a position lacks support in the

statute, which merely indicates that an arm's length transaction does not necessarily extinguish a

subsidy, such as absent the payment of FMV for the company.  See 19 U.S.C. § 1677(5)(F).  The

SAA clarifies that Commerce must exercise its discretion in examining the sale of a subsidized

company "carefully through its consideration of the facts of each case and its determination of

_____

  [8](...continued)
Results at 15–17.

the appropriate methodology to be applied." SAA at 928.  The case law of the Court of Appeals

for the Federal Circuit also places the emphasis in this analysis on the question of whether FMV

was paid for the acquired assets, because if so, no benefit continues to accrue to the buyer.  See

Allegheny Ludlum Corp. v. United States, 367 F.3d 1339, 1346 (Fed. Cir. 2004) ("Allegheny I")

(rejecting a previous methodology that did not consider directly "the economic indicators of the

repayment of a past subsidy"); Allegheny Ludlum Corp. v. United States, 29 CIT 157, 162, 358

F. Supp. 2d 1334, 1339 (2005) ("Allegheny II") ("Therefore, the payment of fair market value

means that the purchasing firm did not receive more than it paid for (assuming the government

did not distort the market in a manner affecting the sale.)").  Previous methodologies adopting

per se rules have been rejected as chronicled in the court's previous opinion.  Commerce must

analyze all relevant information in this fact-intensive analysis.

   Although the court in GPX VII recognized that Commerce's change-in-

ownership methodology is a reasonable method of establishing presumptions for the

extinguishment or non-extinguishment of subsidies based on a process-based approach, it also

held that where there is probative, direct evidence on the record rebutting a presumption that

FMV was not paid, Commerce cannot ignore relevant evidence by adopting a methodology that

refuses to consider it.  The essence of the inquiry is whether FMV was paid, thereby

extinguishing the subsidies.  Commerce may select from a variety of reasonable methodologies,

including imperfect ones based on reasonable presumptions, but it may not foreclose an avenue

of relevant inquiry in doing so or disregard relevant evidence.  Commerce's repeated references

to certain evidence, such as bottom-line objective analyses, not being dispositive misses the

point.  Commerce must consider all probative evidence, whether it finds it independently

dispositive or not. Accordingly, where as here, Commerce is presented with allegedly direct, objective evidence of FMV,[9] it must analyze that evidence and support by substantial evidence any determination with respect to that evidence.[10]

Turning to the appraisals at issue in this case, GPX first asserts, without setting out any substantive arguments, that the Starbright-commissioned appraisal demonstrates that Hebei Tire's assets were sold for FMV. GPX Cmts. 6. This claim plainly fails in the light of the various indications that the appraisal was cursory and its coverage partial. "[W]hen a valuation study, or valuation studies, have not considered all the facts and circumstances, reliance thereon is misplaced." Allegheny II, 29 CIT at 169, 358 F. Supp. 2d at 1345.

As to the Hebei Tire-commissioned appraisal, GPX first disputes Commerce's finding that due to the timing and duration of the appraisal, it was likely a results-oriented document commissioned to comply with regulatory requirements. GPX Cmts. 6–7. GPX argues that Commerce failed to explain why the timing and duration of the appraisal necessarily leads to the conclusion that its analysis was cursory. Id. Commerce is required, however, only to arrive reasonably at its conclusions, and the circumstances of the appraisal readily support Commerce's

---

[9] Throughout its analysis, Commerce emphasizes that it does not calculate a numerical FMV within its process-based approach. Commerce seems to go further by treating its process-based methodology as an end unto itself. At bottom, however, FMV is by definition a value, either a fixed number or a range of numbers. Although FMV may be amorphous and difficult for Commerce to calculate, this fundamental concept cannot be ignored by Commerce when it determines that an objective analysis calculating FMV is not probative.

[10] The court notes that this does not mean Commerce must base its determinations in change-in-ownership situations on objective evidence of the numerical value of FMV, and in fact, given the problems likely to arise in many appraisals, as here, Commerce's ultimate determination often may be to reject the appraisals as faulty and base its decision instead on its process-based analysis.

finding.[11] GPX additionally argues that Commerce failed to reasonably consider the fact that the

appraisal is actually three different appraisals, i.e. not an in toto valuation. Id. at 7. Commerce

explained, however, that the separate appraisals fail to account for certain intangible sources of

value, such as goodwill and intellectual property. Remand Results at 41 n.33.

       GPX also contests Commerce's finding that the appraisers likely lacked adequate

experience for valuing the assets of a tire company. GPX Cmts. 7. Commerce's finding was

based on the response of a Hebei Tire official during verification that "there was only one tire

manufacturer in Xingtai" when asked whether the appraiser had experience in valuing tire

equipment. Remand Results at 18. GPX argues that the statement of the Hebei Tire official does

not imply that the appraiser lacked adequate experience. GPX Cmts. 7. The court is satisfied,

however, that Commerce's skepticism is supported by the evidence, even if Commerce's

determination is not the only reasonable conclusion supported by the record.

       Finally, GPX argues that Commerce's position assumes, and requires, that Hebei

Tire lied to or withheld information from the appraisers. GPX Cmts. 7. This claim is without

merit. Commerce was instructed to examine the veracity of the appraisals, and record evidence

demonstrates that Hebei Tire's records were managed poorly and therefore unlikely to have

provided the appraisers with the information necessary for a full and accurate appraisal. See

Remand Results at 16, 18 (citing Starbright's April 8, 2008 questionnaire response at Exhibit V-

CVD-1 (due diligence report)). Commerce has noted that appraisals of companies are inherently

---

     [11] Specifically, the appraiser valued [[          ]] pieces or sets of equipment in [[      ]], and also may have valued [[                    ]]. Remand Results at 17–18.

*Confidential Information Deleted*

difficult and rely on numerous, often subjective, factors. Here, Commerce pointed to a slew of

problems with the appraisals on the record. Accordingly, Commerce's determination that the

appraisals are not valuable in determining FMV is supported by substantial evidence. Because

Commerce considered and reasonably rejected evidence undermining its presumption that FMV

was not paid in this non-arm's-length transaction, Commerce's remand determination is

supported by substantial evidence and is in accordance with law.

    C. Purchase Price Offset

        GPX finally argues that Commerce failed to provide a credible explanation for its

inability to offset the amount of subsidy transferred to Starbright by the amount of the purchase

price that reflected payment for the subsidy. GPX Cmts. 8–9. Commerce determined on remand

that the use of a purchase price offset would be inappropriate. Remand Results at 24–25.

Commerce also determined that such a calculation is not practicable without satisfactory

appraisals and explained how this calculation differs from those involving the determination of

benefits pursuant to 19 U.S.C. § 1677(5)(E). Id. at 25–28. Defendant argues that Commerce's

explanation is consistent with the court's instructions and should be sustained. Def. Cmts.

20–23.

        As an initial matter, the court rejects Commerce's assertion that a purchase price

offset would be inappropriate under the statute. Remand Results at 24–25. Commerce decided

on remand that such an offset is unnecessary because Commerce already conducted a

countervailing duty analysis of Hebei Tire, and it merely continued to allocate existing subsidies

over the average useful life of the assets. Id. Essentially, Commerce takes the position that a

subsidy is either extinguished in its entirety via the payment of FMV in a change in ownership

transaction or it continues in full force, without any possible abatement based on the purchase

price. This argument, however, runs contrary to the previous holdings of the court and cannot be

credited. See Acciai Speciali Terni S.p.A. v. United States, 28 CIT 2013, 2026, 350 F. Supp. 2d

1254, 1265–67 (2004) ("Commerce should examine the totality of the economic circumstances

to determine whether the pre-privatization subsidy carries over to the post-privatization entity."

(emphasis added)) (citing Allegheny I, 367 F.3d at 1347–48); see also Allegheny II, 29 CIT at

162, 358 F. Supp. 2d at 1339 ("The fair market value of the company takes into account all of a

company's liabilities and assets including assets that were incurred with government support.

Therefore, the payment of fair market value means that the purchasing firm did not receive more

than it paid for (assuming the government did not distort the market in a manner affecting the

sale.)").

        Commerce reasonably found in this case, however, that no reliable evidence

quantifying repayment of the subsidies exists on the record. As the court discussed supra in the

context of Commerce's FMV analysis, Commerce reasonably determined that the appraisals on

the record are unsatisfactory for calculating FMV. Determining the extent to which Hebei Tire's

purchase price reflected payment for Hebei Tire's subsidies, therefore, would require that

Commerce calculate the precise numerical value of FMV of Hebei Tire. Remand Results at

25–28. This calculation, in turn, would require Commerce to value a large number of specialized

machines, buildings, and intangible assets, an inquiry not contemplated under its process-based

methodology.[12]  Id.  The court is persuaded that in the present matter Commerce possesses

neither the expertise nor the resources to undertake such an endeavor where no credible record

evidence exists.  Indeed, Commerce's process-based methodology was upheld in part on these

grounds.  See GPX VII, 893 F. Supp. 2d at 1327.  The court notes, however, that this is not to say

that Commerce could refuse to consider evidence placed on the record demonstrating that full or

nearly-full FMV was paid, thereby compensating the seller for any subsidy benefit that would

otherwise be received and rebutting Commerce's presumption of non-extinguishment.

       GPX also argues that Commerce's explanation is inconsistent with its practices

elsewhere, including its dismissal of the appraisals proffered by GPX in this matter and its ability

to value difficult assets like land in its investigations.  GPX Cmts. 8–9. These arguments are

without merit.  First, Commerce determined in the present matter that GPX's appraisals were

unsatisfactory on the basis of qualitative, process-based considerations.  See Remand Results at

15–18.  Commerce did not evaluate the veracity of each individual valuation in the appraisals or

undertake its own competing appraisal.  Id.  Second, where Commerce has benchmarked land in

the past, it has done so by reference to either available benchmark figures placed on the record or

a process-based methodology.  See, e.g., Final Affirmative Countervailing Duty Determination:

Steel Wire Rod from Germany, 62 Fed. Reg. 54,990, 54,994 (Dep't Commerce Oct. 22, 1997);

Laminated Woven Sacks from the People's Republic of China: Preliminary Affirmative

---

    [12] Commerce noted on remand that the appraisals indicate that the Hebei Tire facility
contained [[         ]] pieces of equipment.  Remand Results at 25 n.17.  Commerce also
noted on remand that the facility comprised [[   ]] buildings.  Remand Results at 26 n.18.  GPX
contests neither assertion.  See GPX Cmts. 8–9.

*Confidential Information Deleted*

Countervailing Duty Determination; Preliminary Affirmative Determination of Critical

Circumstances, In Part; and Alignment of Final Countervailing Duty Determination with Final

Antidumping Duty Determination, 72 Fed. Reg. 67,893, 67,909 (Dep't Commerce Dec. 3, 2007).

Readily accessible benchmark figures are not available on this record for the specialized

machines and buildings that would have to be valued for Commerce to determine the FMV of a

large tire factory or even figures for comparable companies.  Remand Results at 25–27.  The

court declines to impose such a burden on Commerce to develop the record with this information

when the statute does not require it.  Accordingly, Commerce's decision, on this record, not to

offset the subsidy benefit allocated to Starbright is supported by substantial evidence and is in

accordance with law.

**III.     Titan's Loan Benefit Calculation Challenge**

                Titan argues that Commerce failed to explain adequately on remand why an

inflation-based adjustment is a suitably proxy for a currency expectation adjustment to a loan

interest rate benchmark in the context of the Chinese economy and why the omission of this

adjustment would not avoid a distorted benefit calculation.  Titan Cmts. 3–7.  Defendant argues

that Commerce complied with the court's instruction and that its determination is supported by

substantial evidence.  Def. Cmts. 28–31. With the benefit of Commerce's explanation on

remand, the court will sustain the determination.

                In its previous opinion, the court instructed Commerce to "explain why it uses a

currency expectation adjustment for comparing domestic interest rates, why an inflation

adjustment is a suitable proxy for a currency expectation adjustment, and whether the proposed

adjustment by [Titan] is essentially an attempt to countervail against China's distorted inflation

rate or a legitimate attempt to avoid a distorted benefit calculation." <u>GPX VII</u>, 893 F. Supp. 2d at

1330–31.  In its initial investigation, Commerce found that the companies under investigation

had not received any comparable market-based loans in the past and that no comparable

commercial benchmark rates existed within the PRC due to market distortions.  <u>I & D Memo</u> at

104–05.  Accordingly, Commerce calculated a benchmark rate based on a basket of interest rates

from a variety of developmentally similar countries.  <u>Id.</u> at 109–10.  Typically, Commerce

applies a currency expectation adjustment to interest rates calculated for loans to account for the

portion of the rate attributable to expected exchange rate fluctuations.  <u>Id.</u>  As robust forward

exchange rate data were unavailable for the set of developmentally similar countries, however,

Commerce instead used an inflation rate adjustment as a proxy for the exchange rate adjustment.

<u>Id.</u> at 110.

       The statute provides that a benefit received from a subsidized loan is equal to the

"difference between the amount the recipient of the loan pays on the loan and the amount the

recipient would pay on a comparable commercial loan that the recipient could actually obtain on

the market."  19 U.S.C. § 1677(5)(E)(ii).  In calculating this difference, Commerce looks to

comparable loans based on similar structural features including interest calculation, currency, and

maturity.  19 C.F.R. § 351.505(a)(2).  Where the examined firm does not have any comparable

past loans, Commerce normally will examine the national average interest rate for comparable

commercial loans, when such a market exits.  <u>Id.</u> § 351.505(a)(3)(ii).  When this does not exist

on a commercial basis, Commerce looks to interest rates in other comparable markets.  <u>See</u> <u>id.</u>

§ 351.505(a)(2)(ii).  "In making the comparison . . . , the Secretary normally will rely on effective

interest rates."  <u>Id.</u> § 351.505(a)(1).

As a preliminary matter, the court notes that Commerce explained on remand why it uses a currency expectation adjustment to compare cross-country domestic interest rates. Remand Results at 33–34. In short, Commerce has determined that reaching an apples-to-apples cross-country comparison of borrowing costs requires, where available, the use of forward exchange rates to adjust for the extent to which expectations about future movement in currency markets are priced into interest rates, even for domestic loans. Remand Results at 33–34; Def. Cmts. 29. This explanation has not been challenged and is consistent with the regulations.

Defendant's argument, not clearly delineated in the Remand Results, is that Commerce used an inflation adjustment here both as a proxy for a currency adjustment as well as an independent method of obtaining an apples-to-apples comparison. Titan first challenges Commerce's determination that an inflation-based adjustment is a reasonable proxy for exchange rate expectations in the context of the Chinese economy. Titan Cmts. 3–6. Commerce explained on remand the basic proposition that inflation represents a loss in purchasing power and, all else equal, the devaluation of a currency relative to others. Remand Results at 34. Titan argues that although Commerce determined that its methodology should adjust for inflation to the extent that Chinese lenders and borrowers rely on inflation when setting the price of credit, Commerce made no factual determination that this proposition holds in the case of the PRC and ignores record evidence to the contrary. Titan Cmts. 3–6 (citing Remand Results at 35–36). The statement relied upon by Titan deals with Commerce's preference for an adjustment based on the consumer price index ("CPI") versus a gross domestic product ("GDP") deflator and does not represent a Commerce policy of using an inflation adjustment only when there is a perfect correlation between interest rates and inflation rates. See Remand Results at 35–36. The court holds that

Titan's evidence fails to undermine Commerce's reliance on the relationship between inflation

and interests rates in its calculation and that Commerce's determination is supported by

substantial evidence.

   Commerce cites textbook authority providing empirical support for the positive

correlation between inflation and exchange rates. Remand Results at 35 (citing Stephen G.

Kellison, The Theory of Interest 299 (2d ed. 1991) ("[D]espite the difficulty of precisely

measuring [inflation] expectations, the evidence clearly indicates that the relationship [between

expected rates of inflation and interest rates] does exist.")). Titan notes in response that

Commerce previously found that interest rates in the PRC are set subject to Government of

China ("GOC")-imposed deposit rate ceilings and lending rate floors, not on the basis of

unencumbered market forces such as inflation. Titan Cmts. 4 (citing Issues and Decision

Memorandum for the Final Determination in the Countervailing Duty Investigation of Coated

Free Sheet from the People's Republic of China, C-570-907 (Oct. 17, 2007) at 68, available at

http://ia.ita.doc.gov/frn/summary/prc/E7-21046-1.pdf (last visited Oct. 21, 2013)). Titan also

notes that the GOC, unlike many other governments, declines to use interest rates to control

inflation for fear of unmanageable capital inflows. Titan Cmts. 4–5 (citing Pet'r's Cmts. on Loan

Benchmarks (Nov. 9, 2007), PD 145, at 5–6). Neither observation, however, undermines a

determination that inflation and interest rates are positively correlated in the Chinese economy, at

least to some extent, or that lenders and borrowers are subject to the impact of inflation, albeit

possibly suppressed inflation. As Titan failed to put forward information rendering unreasonable

Commerce's conclusion that inflation and interest rates are correlated in the Chinese economy,

the court rejects Titan's challenge and holds that Commerce complied with the court's order.

See Titan Cmts. 5.  Furthermore, because the meaning of an "effective rate" within the

regulations is ambiguous, Commerce was permitted to interpret it in any reasonable manner.

Commerce's decision to use a real interest rate as the "effective rate" is a reasonable

interpretation of this regulation.  Additionally, any argument by Titan in this regard was waived

when Titan failed to challenge the interpretation in its comments before the court.

   Titan also challenges Commerce's rejection of the alternative calculation Titan

proposed during the remand proceeding and in earlier briefing.  Titan Cmts. 6–7.  Titan asserts as

its primary position that no inflation adjustment should be applied because such an adjustment

understates the interest rates paid by Chinese borrowers and because inflation differentials within

the benchmark basket of nominal interest rates are averaged out by virtue of their aggregation.

Id. at 6.  Commerce determined on remand that Titan's proposal would distort the benefit

calculation by failing to account for the extent to which inflation affects domestic interest rates in

the PRC.  See Remand Results at 35.  Titan does not substantively argue in its brief for its earlier

proposal that the GDP deflator be used as a substitute for Commerce's chosen inflation

adjustment, arguing instead that no adjustment should be used.  See Titan Cmts. at 6; Remand

Results at 35–36, 48–50.  The court accordingly does not reach Commerce's rejection of this

alternative, although it notes that this appears to be a choice between two acceptable measures,

each with its own flaws, and Commerce retains discretion in selecting between them.  Titan also

does not justify why the lack of any adjustment is not equally distortive.  Although Commerce

does not always adjust benchmarks to fully reflect economic factors in China, the court is not

persuaded that Commerce's decision to do so here is unreasonable.  As Defendant acknowledged

at oral argument, various imperfect methods exist to calculate a benchmark rate, and

Commerce's choice here seems a reasonable attempt at arriving at a difficult determination.

Therefore, Commerce's choice between its chosen adjustment and no adjustment at all is a

reasonable exercise of its discretion under the statute, and the court sustains it.

**IV.    TUTRIC's Debt Forgiveness**

   TUTRIC challenges Commerce's determination that TUTRIC's submissions

failed to provide information sufficient to overcome the inference that TUTRIC's unpaid debt

obligations were forgiven pursuant to governmental action.  TUTRIC Cmts. 10–19.  Defendant

argues that Commerce's determination is supported by substantial evidence and is in accordance

with law.  Def. Cmts. 23–28.  The court sustains Commerce's determination.

   When Commerce determines that necessary information is not available on the

record, it may use facts otherwise available to reach a determination.  19 U.S.C. § 1677e(a).  If an

interested party has failed to cooperate in providing valid data upon which Commerce can

calculate trade remedy duty rates, Commerce may calculate a rate using inferences that are

"adverse to the interests of that party in selecting from among the facts otherwise available."  19

U.S.C. § 1677e(b).  In so doing, Commerce may rely on information derived from the petition, a

final determination in the investigation, any previous review, or any other information placed on

the record.  Id.  Even when applying adverse facts available ("AFA"), the resulting rate "must be

'a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase

intended as a deterrent to non-compliance.'"  Gallant Ocean (Thail.) Co. v. United States, 602

F.3d 1319, 1323 (Fed. Cir. 2010) (quoting F.lli de Cecco Di Filippo Fara S. Martino S.p.A. v.

United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000)).

   Typically, Commerce cannot rely on an unaffiliated party's failure to cooperate to

justify the application of an AFA rate unless the exporter under investigation also is found

responsible for the behavior in some way.  See 19 U.S.C. § 1677e(b) (noting that Commerce

must determine that a party did not act "to the best of its ability"); see also Nippon Steel Corp. v.

United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003) (requiring Commerce to examine

respondent's actions and assess the extent of respondent's abilities, efforts, and cooperation

before applying adverse inferences); Tianjin Magnesium Int'l Co. v. United States, Slip Op. 11-

17, 2011 Ct. Int'l Trade LEXIS 16, at *5–10 (Feb. 11, 2011) (rejecting the application of an AFA

rate based on the actions of another party); SKF USA Inc. v. United States, 675 F. Supp. 2d

1264, 1275–77 (CIT 2009) (finding unlawful the application of an AFA rate to a cooperative

respondent in order to encourage the compliance of an unaffiliated supplier).[13]

        The court has recognized that in the CVD context, often the government, rather

than the respondent in the investigation, possesses the information needed by Commerce to

evaluate accurately the alleged subsidies.  See, e.g., Fine Furniture (Shanghai) Ltd. v. United

States, 865 F. Supp. 2d 1254, 1260–62 (CIT 2012).  When Commerce has access to information

on the record to fill in the gaps created by a lack of cooperation by the government, however, it is

expected to consider such evidence.  Id. at 1262.  If an alternative benchmark meets the

regulatory criteria and is neutral with respect to a cooperating party, that benchmark would be

superior to the one that adversely affects the cooperating party.  Id. at 1262 & n.10.

        In the present matter, Commerce sought in its initial investigation information

from the GOC concerning the transfer of TUTRIC debt holdings from Bank of China ("BOC") to

---

[13] To the extent that Mueller Comercial de Mexico v. United States, 887 F. Supp. 2d 1360
(CIT 2012), can be read to allow a cooperator's rate in an AD case to be based on the non-
cooperation of another party, the court rejects it.

China Cinda Asset Management Co., Ltd. ("Cinda"), a GOC-owned asset management company,

and then to Avenue Capital Group ("Avenue Asia"), a U.S.-based investment firm.  I & D Memo

at 116.  Commerce explained that this information was material to its investigation because the

transfer agreements could contain provisions forgiving portions of TUTRIC's debt or limiting in

some way the purchaser's ability to collect.  Id.  The GOC refused to release any information,

claiming that the information was proprietary and that the companies involved in the transaction

did not consent to its release.  Id.  Although the GOC acknowledged that it held controlling

interests in the banks and debt servicer, it claimed that it had a policy of not intervening in the

operations of the companies.  Id.  Thus, Commerce applied AFA directly against the GOC and

indirectly against TUTRIC in relation to this debt forgiveness.  Id.  No party argued that TUTRIC

had access to these third-party agreements during the investigation,[14] and it was undisputed that

TUTRIC partially settled its outstanding debt with Avenue Asia and, as requested, produced

documents confirming this agreement.[15]  Br. in Supp. of Pl. Tiajin United Tire & Rubber Int'l

Co., Ltd.'s Rule 56.2 Mot. for J. upon the Agency R. ("TUTRIC Mot.") 16.

       In its previous decision, the court instructed Commerce to consider TUTRIC's

submission of the BOC-Cinda transfer agreement, which Commerce had previously rejected, if

the agreement appeared reliable and its consideration mitigated the collateral effects of the

---

[14] The Remand Results assert that TUTRIC conceded on remand that it had the Cinda-Avenue Asia agreement but did not provide it.  Remand Results at 45.  Both TUTRIC and the Defendant have recognized that this concession was based on a misreading of a document submitted by TUTRIC, but not authored by it.  See Def. Cmts. 28; TUTRIC Cmts. 17. Defendant does not claim that this can serve as a basis for AFA.

[15] No documents on the record explain how the amount of forgiveness eventually provided to TUTRIC was determined, except that it was ultimately embodied in a settlement agreement.

Consol. Court No. 08-00285                                                   Page 27

adverse inference taken against the GOC.  GPX VII, 893 F. Supp. 2d at 1333.[16]  TUTRIC also

provided during the remand proceeding a second submission of what appeared to Commerce to

be affidavits from a TUTRIC official and a Cinda official attesting to the value of the debt

transferred from Cinda to Avenue Asia.  Remand Results at 29.  Commerce determined that a

clause in the BOC-Cinda agreement indicates that associated agreements limiting collection

rights may exist.  Remand Results at 28–29.  Commerce also determined that the second

submission failed to demonstrate that associated agreements did not attach to the Cinda-Avenue

Asia transfer.  Remand Results at 29–30.  TUTRIC contests both findings.  TUTRIC Cmts.

10–19.

       TUTRIC first argues that Commerce failed to consider reasonably the language in

the BOC-Cinda agreement transferring any associated agreements to Cinda.[17]  TUTRIC Cmts.

10–13.  TUTRIC contends that this language is boilerplate, noting the generalized quality of the

---

[16] Defendant does not assert that TUTRIC may be held to account for the GOC's noncooperation as a part of the the GOC.  TUTRIC has been held to be an independent entity.  See Certain New Pneumatic Off-The-Road Tires from the People's Republic of China; Preliminary Determination of Sales at Less than Fair Value and Postponement of Final Determination, 73 Fed. Reg. 9278, 9284, 9286 (Dep't Commerce Feb. 20, 2008).

[17] The agreement states:

[[



]]

TUTRIC's Resp. to Commerce's Jan. 11, 2013, Req. For Info. at Ex. R-1, CD 1 at bar code 3115117-01 (Jan. 16, 2013), ECF No. 416 (Aug. 1, 2013) ("TUTRIC Jan. 11 Resp.").

*Confidential Information Deleted*

language,[18] the size of the transaction, and certain characteristics of the document.[19]  Id.

Although the court agrees that the language may be boilerplate, it declines to take the additional

step of finding Commerce's consideration of the language unreasonable.  Any associated

agreement, in fact, was transferred to Cinda under the transfer agreement, and the use of

boilerplate language does not suggest that an associated agreement does not exist.  This

conclusion is further supported by the brevity of the document and the undisputed fact that a

portion of the debt ultimately was forgiven.  The language, therefore,  provides some evidence to

support the inference that such an agreement could exist based on facts available.

TUTRIC further argues, however, that additional considerations demonstrate that

no such agreement exists.  Specifically, TUTRIC argues that the language at issue indicates that

any associated agreement would be in its possession, that it affirmed to Commerce that it

disclosed all relevant information in its possession, and that Commerce failed to find at

verification any evidence to the contrary.  TUTRIC Cmts. 14–15.  This argument also is

unavailing.  First, although the language implies TUTRIC's possession of any agreement to

---

[18] TUTRIC argues that the word [[     ]] in the phrase [[                              ]]
is indefinite and ambiguous, suggesting only that such an agreement may exist.  TUTRIC Cmts.
11.  TUTRIC also argues that the word [[    ]] in the [[                                    ]]
demonstrates that any associated agreement, if one does exist, does not necessarily concern
[[                ]].  Id.

[19] TUTRIC cites [[                                        ]], including the
following: [[

]] TUTRIC Cmts. 12–13.  TUTRIC also points to the Chinese-language document, which
includes [[

                                                                        ]] Id. at 13.

*Confidential Information Deleted*

which it is a party,[20] the set of agreements about which Commerce is concerned is not limited to

those identified in the transfer agreement.  Remand Results at 46–47.  Second, although

Commerce has an obligation to consider neutral evidence when making inferences to fill in

record gaps, as TUTRIC was a cooperating party, Commerce is not obliged to fill the gaps

proactively as part of its verification procedures.  See Max Fortune Indus. Co. v. United States,

Slip Op. 13-52, 2013 Ct. Intl. Trade LEXIS 57, at *11 (Apr. 15, 2013) ("The purpose of

verification is to 'verify the accuracy and completeness of submitted factual information.'"

(quoting 19 C.F.R. § 351.307(d) (2012))); see also Chia Far Indus. Factory Co., Ltd. v. United

States, 28 CIT 1336, 1344, 343 F. Supp. 2d 1344, 1354 (2004) ("The statute and regulation

require Commerce to verify information but generally leave the scope of verification and the

procedures for conducting it to Commerce's discretion.").  TUTRIC also argues that its second

submission providing the statements of a TUTRIC official and a Cinda official regarding the

value of the holdings transferred from Cinda to Avenue Asia establishes that Avenue Asia

received the full value of creditor's rights originating from the BOC-issued debt.  TUTRIC Cmts.

16–18.  This evidence, however, speaks only to the nominal value of the debt and does not speak

to the possible existence of associated agreements limiting collection rights.  Remand Results at

29; Def. Cmts. 26–27.

       TUTRIC argues generally that Commerce has put it in the impossible position of

proving a negative.  TUTRIC Cmts. 15–16.  Although the court is not without considerable

---

[20] TUTRIC cites the phrase [[
    ]]  TUTRIC Cmts. 14.

*Confidential Information Deleted*

concern for the collateral effects of adverse inferences due to government non-cooperation, the

evidence submitted by TUTRIC during the remand proceeding fails to address directly the

possibility of ancillary agreements.  Such evidence would come directly form the non-

cooperating GOC.  The record includes uncontested evidence of debt forgiveness as well as

transfer agreements that reference possible ancillary agreements concerning debt collection.

Additionally, there is no direct evidence that the debt forgiveness originated with Avenue Asia,

as no record evidence discusses the reasons for the particular amount of debt forgiveness

embodied in the settlement agreement.

    Here, Commerce was confronted with analyzing the transfer and eventual

settlement of loans that never were considered fully-collectible commercial debt, at least by the

time of the transfer from the BOC to Cinda.  The history of these loans, with no regular

payments, repeated renegotiations, inexplicable interest waivers, and no serious efforts to

minimize the lender's loss, indicate that the loans were not treated by the BOC as ordinary

commercial debt.  See Final Calculation Memorandum for Tianjin United Tire & Rubber

International Co., Ltd. at 5–8, CD 591 (July 7, 2008).  Only when the loans were transferred to an

external entity, Avenue Asia, did they take on any commercial indicia and appear as something

more than government equity infusions.  Relying on the amount forgiven (as now conservatively

calculated by Commerce) seems a particularly fair way to value the subsidy.  Had the whole

"loan" amounts been seen as equity infusions from the outset or at one of the earlier debt

forgiveness stages, no doubt the rate of subsidization would be greater.  Instead, Commerce

decided to approach the convoluted history of these renegotiated loans by treating them as debt

forgiveness at the time they were transferred by the last GOC entity holding them to Avenue

Asia.[21]  When taken as a whole, the evidence on the record provided sufficient support for

Commerce's determination that governmental subsidization occurred in the amount now

established based on facts otherwise available, without the need for drawing an adverse inference

against TUTRIC.  See 19 U.S.C. § 1677e(a) ("If . . . necessary information is not available on the

record . . . [Commerce] shall . . . use the facts otherwise available in reaching the applicable

determination . . . .").  Accordingly, the court sustains Commerce's determination on this basis.


### CONCLUSION

For the foregoing reasons, the determination of Commerce is SUSTAINED.

Judgment will be entered accordingly.


                                                        /s/ Jane A. Restani
                                                        Jane A. Restani
                                                        Judge


Dated: October 30, 2013
       New York, New York

---

[21] The loans were bundled and sold as part of a "bad debt sale initiative" along with RMB
21.5 billion in other "non-performing loans" covering 1,500 debtors.  See TUTRIC Mot. 5;
TUTRIC Supp. Questionnaire Resp., Ex. SCVD-11 at 2, CD 200 (Nov. 27, 2007).  TUTRIC
agreed at oral argument that the loans were sold for below the face value of the debt.  Although it
is one more fact missing from the record, given the state of the debt, one may infer that the
discount was steep.

## UNITED STATES COURT OF INTERNATIONAL TRADE

GPX INTERNATIONAL TIRE
CORPORATION, and HEBEI
STARBRIGHT TIRE CO., LTD.,

       Plaintiffs,

TIANJIN UNITED TIRE & RUBBER
INTERNATIONAL CO., LTD.,

       Consolidated Plaintiff,

       v.

UNITED STATES,

       Defendant,

BRIDGESTONE AMERICAS, INC.,
BRIDGESTONE AMERICAS TIRE
OPERATIONS, LLC, TITAN TIRE
CORPORATION, and UNITED STEEL,
PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED
INDUSTRIAL AND SERVICE WORKERS
INTERNATIONAL UNION, AFL-CIO-CLC,

       Defendant-Intervenors.

Before: Jane A. Restani, Judge

Consol. Court No. 08-00285

## JUDGMENT

This case having been duly submitted for decision; and the court, after due
deliberation, having rendered a decisions herein; Now therefore, in conformity with said
decision, it is hereby

ORDERED, ADJUDGED and DECREED that the determination by the United

States Department of Commerce upon the redetermination is SUSTAINED.


/s/ Jane A. Restani
Jane A. Restani
Judge

Dated: October 30, 2013
New York, New York

# CERTIFICATE OF SERVICE

## <u>GPX International Tire Corporation, Hebei Starbright Tire Co., Ltd., Tianjin United Tire & Rubber International Co., Ltd., et al v. United States</u>

### CAFC Court No. 2014-1188

I hereby certify that on March 18, 2014, copies of the foregoing were served upon the following by electronic means (CM/ECF):

>Alexander V. Sverdlov, Esq.
>**U.S. Department of Justice**
>Commercial Litigation Branch – Civil Division
>P.O. Box 480
>Ben Franklin Station
>Washington, D.C. 20044

>Elizabeth J. Drake
>**Stewart & Stewart**
>2100 M Street, NW, Suite 200
>Washington, D.C. 20037

>Mark B. Lehnardt
>**Lehnardt & Lehnardt LLC**
>20 Westwoods Drive
>Liberty, MO 64068

>_/s/ Daniel L. Porter_____
>DANIEL L. PORTER
>dporter@curtis.com
>CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
>1717 Pennsylvania Avenue, N.W.
>Washington, D.C. 20006
>202-452-7340

>Counsel to Plaintiff-Appellants
>GPX International Tire Corp. and Hebei Starbright Tire Co., Ltd.

**Certificate of Compliance Pursuant to Rule 32(a)(7)(C)**

This brief has been prepared utilizing Microsoft Word 2010 using a proportionally spaced typeface (14 point Times New Roman font).

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned certifies that this brief complies with the requirement of Fed. R. App. P. 32(a)(7)(B)(i). Specifically, excluding those exempted portions of the brief, as set forth in Fed. R. App. P. 32(a)(7)(B)(iii), this brief contains 13,947 words. In accordance with Fed. R. App. P. 32(a)(7)(C), this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Daniel L. Porter
Daniel L. Porter

Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 452-7373

Counsel for Plaintiff-Appellants