**2014-1188**

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

GPX INTERNATIONAL TIRE CORPORATION, HEBEI STARBRIGHT TIRE CO., LTD.,
TIANJIN UNITED TIRE & RUBBER INTERNATIONAL CO., LTD.,
                                        *Plaintiff-Appellants,* and

MINISTRY OF COMMERCE, PEOPLE'S REPUBLIC OF CHINA,
                                        *Plaintiff,*
                          v.
                  UNITED STATES,
                                        *Defendant-Appellee,* and

BRIDGESTONE AMERICAS, INC., BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC,
                                        *Defendants,* and
TITAN TIRE CORPORATION, UNITED STEEL, PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS
INTERNATIONAL UNION, AFL-CIO-CLC
                                        *Defendants-Appellees.*

---

Appeals From The United States Court Of International Trade
Case No. 08-CV-00285, Judge Jane A. Restani

---

**REPLY BRIEF OF PLAINTIFF-APPELLANTS**
**GPX INTERNATIONAL TIRE CORPORATION AND HEBEI STARBRIGHT**
**TIRE CO., LTD.**

---

Daniel L. Porter
James P. Durling
Matthew P. McCullough
Claudia D. Hartleben

Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 452-7373

Counsel for Plaintiff-Appellants GPX International Tire
Corporation and Hebei Starbright Tire Co., Ltd.

July 28, 2014

# TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................ i

TABLE OF AUTHORITIES .................................................................. ii

SUMMARY OF ARGUMENT ................................................................1

ARGUMENT ..........................................................................................3

I.   THE ARGUMENTS TO OVERTURN THIS COURT'S RULING IN
     *WIREKING* SHOULD BE REJECTED .........................................3

II.  THE MARCH 2012 ACT VIOLATES DUE PROCESS .............................6

   A.  GPX Has A Vested Interest In Its CVD Deposits ..........................6

   B.  The Retroactive Aspects Of The March 2012 Act Lack A Rational Basis...11

      1.   GPX's due process claim does not rest "solely" on the fact that
           the Act upsets settled expectations......................................11

      2.   Curative intent as argued by Commerce leads to a self-fulfilling
           rational basis and the nullification of any due process restraint .........13

III. THE ACT VIOLATES THE *EX POST FACTO* CLAUSE ..........................23

CONCLUSION AND RECOMMENDED APPELLATE REMEDY ....................30

# TABLE OF AUTHORITIES

**Constitutional Provisions**

U.S. Const. art. III, § 9, cl. 3 .............................................................. 23, 26

**Cases**

*Arjay Assoc. Inc. v. United States*,
   891 F.2d 894(Fed. Cir. 1989) ..........................................................8

*Board of Trustees of Univ. Ill. v. United States*,
   289 U.S. 48 (1933).............................................................................7

*Buttfield v. Stranahan*,
   192 U.S. 470 (1904)...........................................................................8

*Carver v. Lehman*,
   558 F.3d 869 (9th Cir. 2009) .............................................................5

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
   467 U.S. 837 (1984)................................................................... 14, 15

*Commonwealth Edison v. United States*,
   271 F.3d 1327 (Fed Cir. 2001) ................................................ 21, 22

*General Motors Corp. v. Romein*,
   503 U.S. 181 (1992)................................................................... 18, 19

*Georgetown Steel Corp. v. United States*,
   801 F. 2d 1308 (Fed. Cir. 1986) .............................................. passim

*GPX International Tire Corp.* v. *United States*,
   666 F.3d 732 (Fed. Cir. 2011) .................................... 13, 14, 15, 17

*Graham & Foster v. Goodell*,
   282 U.S. 409 (1931).........................................................................20

*Guangdong Wireking Housewares & Hardware Co. Ltd. v United States*,
   745 F.3d 1194 (Fed. Cir. 2014) ............................................... passim

*Huayin Foreign Trade Corp. v. United States*,
    322 F.3d. 1369 (Fed Cir. 2003) .................................................................24

*Key Enterprises of Delaware, Inc. v. Venice Hosp.*,
    9 F.3d 893 (11ᵗʰ Cir. 1993) ...............................................................5

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*,
    462 U.S. 669 (1983)...........................................................................5

*North American Trading Corp. v. United States*,
    783 F.2d 1031 (Fed. Cir. 1986) .......................................................8

*Norwegian Nitrogen Products v. United States*,
    288 U.S. 294 (1933).........................................................................8

*Parkdale v. United States*,
    475 F.3d 1375 (Fed. Cir. 2007) .............................................. 9, 10

*Smith v. Doe*,
    538 U.S. 84 (2003)....................................................................... 23, 26

*Syva Co. v. United States*,
    681 F. Supp. 885 (Ct. Int'l Trade 1988) ........................................9

*Travenol Labs., Inc. v. United States*,
    118 F.3d 749 (Fed. Cir. 1997) ........................................................9

*United States v. Carlton*,
    512 U.S. 26 (1994).................................................................. 18, 19

*United States v. Darusmont*,
    449 U. S. 292 (1981) .....................................................................19

*United States v. Hemme*,
    476 U.S. 558 (1986).......................................................................12

*Usery v. Turner Elkhorn Mining Co.*,
    428 U.S. 1 (1976)................................................................... 11, 12

**Statutes**

19 U.S.C. § 1677(18) ...............................................................................21

Pub. L. No. 100-418, 102 Stat. 1107 (1988).............................................17

Pub. L. No. 103-465, 108 Stat. 4809 (1994)............................................................17

Pub. L. No. 112-99, 126 Stat. 265 (2012)........................................................ passim

Pub. L. No. 67-318, 42 Stat. 858 (1922)..........................................................7, 8

Tea Inspection Act of 1897, c. 358, 29 Stat. 604.......................................................8

**Rules**

F.C.R. 35(b) ......................................................................................................5

Fed. R. App. P. 35(a) ...................................................................................4

## SUMMARY OF ARGUMENT

Commerce and Petitioners fail to address persuasively the serious constitutional violations caused by the retroactivity provision of the March 2012 Act, Application of Countervailing Duty Provisions to Nonmarket Economy Countries, Pub. L. No. 112-99, 126 Stat. 265 (Mar. 13, 2012) (the "March 2012 Act").

As a preliminary point, Petitioners' arguments to overturn a key aspect of this court's ruling in *Wireking* are unavailing. The ruling that the March 2012 Act constituted a *bona fide* change to the then existing CVD law was not mere *dicta* and thus cannot be ignored. Further, the specific requirements under Rule 35 for *en banc* review of the decision have not been met, since Petitioners have not identified any conflict with relevant precedent and have not explained how the change versus clarification issue is in fact an issue of "exceptional importance."

The March 2012 Act impermissibly infringes GPX's due process rights. GPX has a vested interest in its CVD deposits; although interests may not vest at the time of entry, liquidation is the operative event when interests do vest. The court must consider the fact that GPX's imports, long since entered, would have liquidated but for GPX's efforts to preserve its interests in relation to the very

matter in dispute. The retroactive creation of new authority should not now justify a finding that GPX has no vested interest in those CVD deposits.

Due process is also infringed because the retroactive aspects of the March 2012 Act lack a rational basis. Commerce's efforts to justify "curative intent" as a rational basis only demonstrate why such intent must have limits if due process is to survive as anything more than an abstract and unobtainable theory. This court's opinion in *Edison* also does not save the March 2012 Act on rational basis grounds, as the retroactive provisions are disproportionate and are contrary to GPX's reasonable expectations – the two conditions this court has said, if present, would prevail where due process is challenged.

The March 2012 Act is also unconstitutional under the *Ex Post Facto* Clause of the Constitution as retroactive punishment. The March 2012 Act is "so punitive in purpose or effect" as to negate any general congressional intent to deem the changed law to be civil. Whether using the Supreme Court framework from *Smith* or the Federal Circuit framework form *Huayin*, the retroactivity provision of the 2012 Act is sufficiently punitive to trigger the constitutional prohibition on retroactive punitive laws. This court should therefore strike down as unconstitutional the statutory provision in the March 2012 Act authorizing the retroactive imposition of the countervailing duties that were contrary to law at the time they were imposed and that are punitive in this particular context.

# ARGUMENT

## I. THE ARGUMENTS TO OVERTURN THIS COURT'S RULING IN *WIREKING* SHOULD BE REJECTED

The first argument advanced by Defendant-Appellees Titan Tire and USW ("Petitioners") is to ask this court to either ignore or to overturn one of this court's key rulings in *Guandong Wireking Housewares & Hardware v. United States*, 745 F.3d 1194 (Fed. Cir. 2014) ("*Wireking*"). Specifically, *Wireking* found that the March 2012 Act constituted a *bona fide* change in then existing CVD law. For this reason, it was necessary to address the constitutional law arguments advanced by Plaintiff-Appellant. *See Wireking,* 745 F.3d at 1200-1202. In their opposition brief Petitioners argue that this *Wireking* ruling was mere *dicta* and therefore should be ignored. Petitioner Br. at 11. Petitioners then argue that, should this court not agree with such characterization, this court should overturn this part of the *Wireking* ruling by means of an *en banc* hearing. Petitioner Br. at 12-32.

Both of these arguments should be rejected. At the outset we note that Defendant-Appellee United States ("Commerce") does <u>not</u> join these arguments. Even though it has vigorously opposed Plaintiff-Appellants' arguments in this case, Commerce has not advanced these same arguments that *Wireking* was wrongly decided. Petitioners are alone in making this argument.

Contrary to the argument that the *Wireking* ruling constituted mere *dicta* that can be ignored, the *Wireking* ruling that the March 2012 Act changed rather than

clarified the law was an integral part of the ultimate holding. Without such a ruling, plaintiff-appellant's constitutional law challenges would not have been addressed. Indeed, Petitioners effectively admit as much in their response brief when they argue that because the March 2012 Act "clarified and confirmed CVD law, rather than changed it substantively, . . . {it} does not implicate constitutional concerns." Petitioner Br. at 10. We submit that a ruling for which all parties (and the Court) agree is a condition precedent for the ultimate holding cannot be characterized as mere *dicta*. Indeed, Petitioners do not offer any case support for their argument.

Recognizing the weakness of this argument, Petitioners then present extended arguments as to the purported flaws of *Wireking* on this issue. Yet even after 20 pages, Petitioners do not provide any real justification as to <u>why</u> an *en banc* hearing is appropriate. Rather, the overwhelming majority of the arguments simply repeat virtually the same arguments made by the defendant-appellees in *Wireking* as to why the March 2012 Act should be considered only a clarification in CVD law. All of these arguments were fully considered and rejected in *Wireking*.

Rule 35 of the Federal Rules of Appellate Procedure and the Federal Circuit Rules sets forth the applicable criteria for seeking an *en banc* hearing. Federal Appellate Rule 35 provides that an *en banc* hearing "is not favored and ordinarily

will not be ordered." Fed. R. App. P. 35(a). Federal Circuit Rule 35 describes the

limited circumstances where *en banc* hearing might be appropriate – either (1) a

conflict with a Supreme Court decision or another binding decision of the same

court; or (2) an issue of "exceptional importance" such as a conflict with other

circuit court decisions. *See* Federal Circuit Rule 35(b). The essence of both rules

is that a simple desire to reargue an issue is not enough for an *en banc* hearing;

something more (indeed much more) is needed.

Attempting to satisfy the criteria of Federal Circuit Rule 35, Petitioners

assert that the *Wireking* ruling conflicted with (a) a single Supreme Court decision,

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 678-679

(1983) and (b) and two decisions by other courts of appeals, *Key Enterprises of

Delaware, Inc. v. Venice Hosp.*, 9 F.3d 893, 898 (11th Cir. 1993) and *Carver v.

Lehman*, 558 F.3d 869, 878-879 (9th Cir. 2009). However, none of these cases

actually conflicts with *Wireking* and therefore none of the cases provide

justification for meeting the criteria of Rule 35.

These cases are all unavailing because they do not address at all the limits on

Congress' power to substitute its judgment for that of the courts. The statutory

change reversing the prior Supreme Court decision at issue in *Newport News*

applied only prospectively, *Newport News*, 462 U.S. at 671 n.2, and thus had no

retroactive effect to be considered. That Supreme Court decision therefore did not

address at all the key issue in *Wireking*, and in no way contradicts the correct statement that the important principle of separation of powers means that "Congress does not possess the power to nullify our decision retroactively." *Wireking*, 745 F.3d. at 1201. And both *Carver* and *Key Enterprises* involve general discussions of the legal status of court decisions at different points in time, divorced from any congressional change in the law, let alone any congressional effort to retroactively substitute its judgment for that of an Article III court.

In short, none of these decisions raise the type of conflict envisioned by Rule 35, and therefore do not justify *en banc* hearing on this issue

## II. THE MARCH 2012 ACT VIOLATES DUE PROCESS

### A. GPX Has A Vested Interest In Its CVD Deposits

Commerce argues that GPX has no vested interest in CVD deposits in light of Congress' plenary power to regulate foreign commerce. According to Commerce, no interest may accrue even in situations where the deposits at issue were collected despite the unambiguous terms of a statute that precluded such collection, only to be made "lawful" years after the fact. Commerce Br. at 15-16. Petitioners make similar arguments. Petitioner Br. at 40-43. Both misconstrue the prevailing jurisprudence on the matter and GPX's argument.

Commerce asserts that GPX "tellingly, cannot cite a single case from this court's or the Supreme Court's jurisprudence that would indicate that it has a

vested right in past duties." Commerce Br. at 16. This statement misses the point.

The more telling point is that the jurisprudence offered by Commerce and

Petitioners to support their position relate to claims of more immediate or

prospective interests in foreign trade already falling within the purview of

established authority. This jurisprudence does not expressly address the unusual

circumstances of this case under which duties are unlawfully collected in the

absence of any authority to do so, only to be made "lawful" upon retroactive

change of a statute years after the entries to which the duties applied were made.

GPX cited to some of this same jurisprudence in its opening brief to make the

distinction, GPX Br. at 37-39, and it can easily distinguish the additional

jurisprudence cited by Commerce and Petitioners.

For example, Commerce cites to *Board of Trustees of Univ. Ill. v. United

States*, 289 U.S. 48 (1933), where the Supreme Court explained that "[n]o one can

be said to have a vested right to carry on foreign commerce with the United

States." *Board of Trustees,* 289 U.S. at 57. But in that case Congress had already

determined the terms upon which the university could enter its imported

merchandise, including the customs duties prescribed by the Tariff Act of 1922,

Pub. L. No. 67-318, 42 Stat. 858 (1922), before entry was ever made. 289 U.S. at

56. The dispute in *Board of Trustees* was over a different issue, namely whether a

state entity was immune from such duties. 289 U.S. at 57-58. Similarly, in

*Buttfield v. Stranahan*, 192 U.S. 470 (1904), the issue was not whether regulatory action was taken against imports of tea in the absence of any statutory authority or regulatory regime. To the contrary, the Tea Inspection Act of 1897, c. 358, 29 Stat. 604, along with the delegation of authority to the Treasury Department to prohibit entry under the Act, existed prior to the entries upon which that law operated. *Buttfield*, 192 U.S. at 491-492. The same factual posture existed in *Norwegian Nitrogen Products v. United States*, 288 U.S. 294 (1933), dealing with existing authority under the Tariff Act of 1922. *See Norwegian Nitrogen Products*, 288 U.S. at 302-303. *See also Arjay Assoc. Inc. v. United States*, 891 F.2d 894, 896 (Fed. Cir. 1989) (Sustaining order prohibiting <u>future</u> imports, holding that "no one has as a Congressionally untouchable right to the continued importation of any product."). These are not cases dealing with severe retroactive changes in a law or any regulatory regime that altered the terms of liability associated with prior import entries.

To turn the table, Commerce is unable to cite a single case from this court's or the Supreme Court's jurisprudence indicating that GPX's interest in its deposits may never vest. This court has been cautious in addressing that question, finding only that "[n]o vested right to a particular classification or rate of duty or preference is acquired <u>at the time of importation</u>." *North American Trading Corp. v. United States*, 783 F.2d 1031, 1032 (Fed. Cir. 1986)(emphasis added). Indeed,

when confronting such questions of retroactivity, this court decidedly has not ended the analysis before it even begins based on a conclusion that the Appellant can never assert a vested interest. In *Parkdale v. United States*, 475 F.3d 1375 (Fed. Cir. 2007), this court considered whether the retroactive effects of an antidumping ("AD") policy promulgated after affected import entries were made was impermissibly retroactive. The Court identified liquidation as the "operative event" giving rise to a vested interest. *Parkdale*, 475 F.3d at 1379 (citing *Travenol Labs., Inc. v. United States*, 118 F.3d 749, 753 (Fed. Cir. 1997) and *Syva Co. v. United States*, 681 F. Supp. 885, 890 (Ct. Int'l Trade 1988)). This is the same point of equity argued by GPX in its affirmative brief. GPX Br. at 38-40. GPX's CVD deposits would have been liquidated long ago. Indeed, there would have been automatic liquidation of GPX's entries shortly after the first anniversary month of the AD/CVD orders (September 2009). Liquidation did not occur only because GPX chose to challenge the legal authority of Commerce to apply the CVD law to those entries in the first instance. Failing to find that GPX's interests vested in September 2009 would place GPX in the unreasonable position of having forfeited its interests in light of the retroactive change in the law because it took the very action prescribed under the law to preserve its interests.

Commerce's and Petitioners' responses to this point of equity are unavailing. Commerce's response is circular, underscoring the unreasonable position GPX

identifies.  According to Commerce, "{h}ad GPX's goods been liquidated in 2009 . . . they would have been subject to the CVD rate that Commerce calculated. Thus, even under its own logic, GPX cannot contend that it ever had a vested right in not having CVDs applied to its goods."  Commerce Br. at 16-17.  GPX's vested interest is in its deposits.  To be certain, GPX exercised its rights to recover its CVD deposits.  But the fact that Commerce calculated a CVD rate for GPX's entries in the absence of any statutory authority to do so is the very action in dispute.  The retroactive creation of new authority should not now justify a finding of unattainable interest in those CVD deposits.

For their part, Petitioners attempt to rely on *Parkdale* to establish that GPX's interests could never vest given the inherently retrospective nature of duty assessment.  *See* Petitioner Br. at 41-42.  In other words, because GPX could not know its final CVD liability at the time of entry, it had no vested interest.  But that argument completely ignores the facts in *Parkdale* as distinguished from the facts here.  In *Parkdale*, the Appellant challenged a change in Commerce's reseller policy under the AD law that affected entries made prior to the policy's promulgation but before the entries were liquidated.  *Parkdale*, 475 F.3d at 1376-1378.  But in that case: (1) statutory authority existed to apply the antidumping law to Parkdale's entries; (2) Parkdale was fully aware that its entries were subject to lawful dumping liability; and (3) Parkdale was fully aware that under the U.S.

retrospective system final antidumping liability is determined well after entries and AD deposits on those entries are made. *Id.* In this case, no authority to collect CVD deposits even existed, rendering any further comparison of the facts unnecessary. The question has little to do with whether or not GPX could know its final CVD liability at the time of entry. Under the unambiguous terms of the statute no CVDs could apply. As GPX noted in its initial brief, GPX could in fact quantify its interest in CVD deposits. It owed none and therefore was entitled to all duties that were collected. For these reasons, GPX should be found to have a vested interest in its CVD deposits.

### B. The Retroactive Aspects Of The March 2012 Act Lack A Rational Basis

#### 1. GPX's due process claim does not rest "solely" on the fact that the Act upsets settled expectations

Commerce's and Petitioners' initial response to GPX's due process claim is basically that establishing a due process violation is hard, and therefore GPX must lose. Both seem largely content to cite the general principle that "legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations." *See* Commerce Br. at 33 and Petitioners' Br. at 40, quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16 (1976). But GPX is not arguing that its claim rests "solely" on the fact that the March 2012 Act upsets otherwise settled expectations, although that is certainly part of its case. What both

Commerce and Petitioners neglect is that the Supreme Court in *Usery* also made clear than the "retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former." *Usery*, 428 U.S. at 17. This is why *Usery* went on to take into account such issues as notice and reliance as part of its analysis. *Id.* Contrary to what Commerce and Petitioners may imply, due process is more than an abstract theory – something that looks good on the books, but has no real meaning. The Supreme Court is not waxing poetic. Thus, when the Supreme Court establishes that it is "necessary to consider the nature of the tax and the circumstances in which it is laid," *United States v. Hemme*, 476 U.S. 558, 568 (1986), before reaching any conclusion on constitutionally sufficient due process, the Supreme Court means what it says. To that end, meaning must be given to Supreme Court jurisprudence that helps define the outer limits of rational basis when looking at specific facts. As such, questions of notice, reliance, whether retroactive CVD duties were applied under circumstances in which subsidies were not previously cognizable in the market examined, and the very long period of retroactivity in this particular case, are important factors as identified by Supreme Court jurisprudence. *See* GPX Brief at 21-24. They cannot be ignored.

### 2. Curative intent as argued by Commerce leads to a self-fulfilling rational basis and the nullification of any due process restraint

#### (a) Commerce wrongly attempts to re-litigate now settled jurisprudence regarding Commerce's authority to apply the CVD law to NMEs

Commerce's rebuttal of GPX's arguments concerning the limits of curative intent as grounds for establishing a rational basis for retroactive legislation quickly devolve into efforts to re-litigate this court's holding in *GPX International Tire Corp. v. United States*, 666 F.3d 732 (Fed. Cir. 2011) ("*GPX V*"). The essence of that misplaced effort is found in Commerce's assertion that "the problem that the legislature sought to correct was not of its own doing, but that of a court." Commerce Br. at 27. This statement follows upon a string of misrepresentations of this court's findings in *GPX V*.

Commerce asserts that "the Court *unexpectedly* determined that Commerce lacked authority to impose" countervailing duties against non-market economies. Commerce Br. at 19 (emphasis added). The implication is that there were rational grounds for misunderstanding or mistake. But that position is untenable in light of this court's findings in *Georgetown Steel Corp. v. United States*, 801 F. 2d 1308 (Fed. Cir. 1986) or *GPX V*. In *Georgetown Steel* this court in 1987 expressly found that:

> Congress, however, has decided that the proper method for protecting the American market against selling by nonmarket economies at unreasonably low prices is through the antidumping law. This law is designed to protect domestic industry from injury resulting from the sale in the United States of foreign merchandise that is priced below its fair value, and provides a remedy therefor in 19 U.S.C. Sec. 1677b(c). If that remedy is inadequate to protect American industry from such foreign competition--a question we could not possibly answer--it is up to Congress to provide any additional remedies it deems appropriate.

*Georgetown Steel*, 801 F. 2d at 1318. In *GPX V* this court further concluded that "*Georgetown Steel* is equally applicable to the revised statute" that emerged in the years after *Georgetown Steel* was issued. *GPX V*, 666 F. 2d at 739. The Court never said *Georgetown Steel* rested on *Chevron* deference, *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), only that any argument about *Chevron* was immaterial given an extremely long and telling legislative history dating back to at least 1984. *Id.* at 740-743.

Commerce also argues that this court in *GPX V* found an "inherent contradiction" in the statute between language that CVDs were to be imposed on subsidized imports from any country, and legislative history suggesting "to this court that the plain language did not mean what it said." Commerce Br. at 28. This argument, recycled from *GPX V,* has already been considered by the court. Nothing could be further from the truth than what Commerce now argues. This court found no "inherent contradiction." This court found that Commerce's

statutory argument failed because it failed to address the relevant provision. *See GPX V*, 666 F.3d at 737-738. Once again, Commerce's efforts to reinvent the statute as ambiguous are unavailing.

Finally, Commerce contends that this court in *GPX V* found that Commerce had the authority to apply countervailing duties to imports from non-market economies, but only lost that authority as a consequence of legislative ratification. Commerce Br. at 29. Once again, this characterization is inaccurate. This court wrote not a single sentence finding that Commerce once had authority to apply the CVD law to NMEs, but then lost that authority upon legislative ratification of the opposite position. As previously discussed, this court in *Georgetown Steel* had already found that Commerce never had such authority. *Georgetown Steel*, 801 F. 2d at 1318. *GPX V* merely confirmed that result. *GPX V*, 666 F. 2d at 739. The court's treatment of legislative ratification in *GPX V* served only to dismiss any doubt that *Georgetown Steel* rested on *Chevron* deference and not the unambiguous terms of the statute. *Id*.

> **(b) Commerce's treatment of curative intent underscores the rational basis limits that must apply to such a rationale**

Commerce fares no better in attempting to justify curative intent as a rational basis for the retroactive effect of the March 2012 Act. Commerce's arguments serve only to lay bare the arbitrary and harsh nature of the changed law's

retroactive treatment in this case. Commerce begins with the erroneous characterization that the mistake or error at issue in this case lies with the court's judicial opinion. *See*, *e.g.*, Commerce Br. at 25 and 27. There is no basis for such a claim when the federal judiciary is the institution entrusted with interpreting the law, and in this case the court found the law at issue to be unambiguous. Congress may disagree with the result and change the law, but Congress cannot under our constitutional system say that the court was in error. The cause of any "unexpected problem" or "error" in an unambiguous statute can only come from Congress itself, not the Court. In any event one must ask whether terms such as "unexpected" or "error" are even appropriate in laying the foundation for Congress' "curative" act.

Under the circumstances of this case it is not reasonable to say that the Court's opinion in *GPX V* was "unexpected." This much is clear from the *Georgetown Steel* and *GPX V* opinions, where the court recounted the origins of the law and decades of <u>congressional understanding</u> of the contours of the law. In *Georgetown Steel* the court expressly stated that "it is up to Congress to provide any additional remedies it deems appropriate" to address NME imports. *Georgetown Steel,* 801 F. 2d at 1318. In *GPX V*, the court established that Congress was "well aware" of the state of the law, even to the extent of expressly rejecting a statutory provision to supersede *Georgetown Steel*. *GPX V,* 666 F.3d at

739-745.  These facts do not lend themselves to finding an objectively

"unexpected" opinion.

Statements of congressional intent now advanced by Commerce are equally

problematic.  As noted by Commerce, "[o]f the nineteen representatives who spoke

during the debate, seventeen either described the *GPX V* opinion as erroneous or

stated that the Act was designed to restore Commerce's ability to apply CVDs to

nonmarket economy countries."  Commerce Br. at 22-23.  But these floor

statements speak as much of original intent as they do curative intent.  The

problem, of course, is that none of these lawmakers were Members of Congress at

the inception of the CVD law, which dates back to the late nineteenth century.

*Georgetown Steel*, 801 F. 2d at 1314.  Only three lawmakers among the nineteen,

Rep. Dingell, Rep. Levin, and Rep. Visclosky, were Members of Congress when

the *Georgetown Steel* opinion was issued in 1986.  And only five lawmakers,

including the previously mentioned along with Rep. Slaughter, were present during

congressional debate on the Omnibus Trade and Competitiveness Act of 1988,

Pub. L. No. 100-418, 102 Stat. 1107 (1988), that considered and rejected authority

to supersede *Georgetown Steel*.  *See GPX V,* 666 F.3d at 741-742.  Eleven of the

lawmakers were not even present during debate on the Uruguay Round

Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994), which established

that "countervailable subsidy" was to have the same meaning as "bounty or grant"

and "subsidy" as used under prior versions of the CVD law.  *See GPX V*, 666 F.3d at 743.  Yet, nearly thirty years after *Georgetown Steel* was decided we are now told by Commerce through the statements of these lawmakers that Commerce always had the authority to apply the CVD law to NMEs based on Congressional intent.  This line of reasoning underscores why "curative intent" as grounds for establishing rational basis must have limits.  Despite arguments to the contrary, Commerce is advancing a *per se* rule whereby Congress need only invoke the magic words "curative intent" to nullify due process claims in relation to retroactive legislation, regardless of the circumstances.

Stripped to its core, Commerce argues that Congress may always claim judicial misinterpretation in upholding retroactive legislation, despite the unambiguous terms of a statute or an original intent of Congress separated by decades of time from the lawmakers who now claim it but were not even present at its inception.  These facts are in sharp contrast to both *General Motors Corp. v. Romein*, 503 U.S. 181 (1992) and *United States v. Carlton*, 512 U.S. 26 (1994), which Commerce characterizes as founded on the principle that "retroactive corrections are appropriate when there is a misinterpretation--or a possibility of misinterpretation."  Commerce Br. at 27.  But this general statement says nothing of the particular facts that shaped those cases.  In both cases, legislative reaction to clarify or cure the purported defect was far more immediate.  In *Romein*, the source

of controversy was a 1981 statute the legislature swiftly sought to clarify in 1982 through concurrent resolution, and later through new legislation in 1987. *Romein*, 503 U.S. at 184-185. Unlike the case at hand, we are not talking the passing of decades, if not more than a century, between the time a statute is passed and when Congress sought to ensure its intent through curative action. Given the sharply differing timeframes, one can at least assume with greater confidence that the legislature at work in *Romein* could more immediately identify with its original intent. As previously mentioned in GPX's affirmative brief, *Romein* had the added element of an ambiguous statute where the prospect of misinterpretation or "possibility of misinterpretation" was at least arguably in play. *Romein*, 503 U.S. at 184. *Carlton* fits the same pattern, with the curative action taken less than a year after the original statute was passed, and the legislative history to the original provision was consistent with the subsequent curative action. *Carlton*, 512 U.S. at 31-32. *Carlton* also generally fell within the limits of rational basis with respect to tax legislation given that the period of retroactivity was just slightly more than on year, and therefore "confined to short and limited periods required by the practicalities of producing national legislation." 503 U.S. at 33 (citing *United States v. Darusmont*, 449 U. S. 292, 296 (1981)).

Far from "trifling distinctions" claimed by Commerce, Commerce Br. at 30, GPX has in fact identified the dividing line between the retroactive aspects of the

Act "and the case of a curative statute aptly designed to remedy mistakes and defects in the administration of government where the remedy can be applied without injustice." *Graham & Foster v. Goodell*, 282 U.S. 409, 427 (1931). The particular facts are important and must be taken in to account. First, prior to 2012 Commerce never had the authority to apply the CVD law to imports from NMEs based on the unambiguous terms of the statute as found by both this court and confirmed by Congress itself over a period of decades. Second, beginning on December 17, 2007, Commerce ordered that import entries made by GPX post CVD deposits, which eventually amounted to near $1 million by the time of GPX's last entry. GPX immediately commenced lengthy litigation and also participated in the first administrative review of the CVD order to preserve its interest in those deposits against Commerce's *ultra vires* action. Third, with the court's opinion in *GPX V* issued at the end of 2011, GPX prevailed on its arguments that Commerce lacked the statutory authority to apply the CVD law to NME imports. Fourth, with its imports long since entered into the United States, Congress and the Executive on March 13, 2012 reacted to this court's opinion in *GPX V* and retroactively imposed CVD liability on GPX going back nearly five years. Pub. L. No. 112-99, 126 Stat. 265 (2012). This legislation addressed activity never before cognizable as a countervailable subsidy, a decidedly market-oriented concept, under a statute

that expressly defined NMEs as economies that effectively have no markets. *See* 19 U.S.C. § 1677(18).

> **(c)** **This court's opinion in *Edison* does not save the Act from due process challenge**

Commerce closes its argument by asserting that even if notice and reliance are considered, GPX could still not establish a due process violation, citing to this court's holding in *Commonwealth Edison v. United States*, 271 F.3d 1327 (Fed Cir. 2001). Commerce Br. at 35-37. To this end, Commerce effectively concedes that the March 2012 Act is "severely retroactive." But it dismisses that fact in light of the *Edison* opinion finding that even severely retroactive economic legislation may be constitutional where: "(1) Congress reasonably concluded that the party subjected to retroactive obligations benefited from activity that contributed to a societal problem, and liability is not disproportionately imposed on that party; and (2) the imposition of retroactive liability [was not] contrary to that party's reasonable expectations." Commerce Br. at 34, quoting *Edison,* 271 F. Supp. at 1346. The problem with the case at hand, however, is that it fits neither of these conditions.

Whatever policy decision Congress made about benefits GPX derived from its imports, Commerce cannot now claim the response was proportionate. As already discussed, the asymmetrical response to double counting in the March 2012 Act means that entries made prior to the changed law are exposed to

disproportionate liability because Congress denied any adjustment it affords entries made after the changed law.  As far as reasonable expectations, there is no comparison.

In *Edison*, the plaintiff itself was on record in its complaint as admitting that its obligation to decontaminate and decommission nuclear facilities "was an obligation well understood . . . throughout the industry."  *Edison,* 271 F. Supp. at 1332.  Moreover, the plaintiff actively participated in shaping the legislation that imposed what it later deemed to be an illegal exaction.  *Id*. at 1334.  Indeed, plaintiff's legislative proposal on cap limits became the cap on special assessment in the legislation it subsequently challenged.  *Id*. at 1336.  GPX had no such expectations.  To this end, Commerce confuses GPX's participation in the CVD proceedings that led to duties as proper notice that such duties could apply.  Commerce Br. at 35.  To the contrary, GPX's participation was based on the unambiguous terms of a statute that indicated such duties could <u>not</u> apply and GPX's desire to preserve its interests in the matter.  Commerce's only response appears to be that legislative action after the fact is always possible.  *Id*. at 36-37.  But that argument is no better than the semantics of Commerce's "curative intent" argument.  It is not about whether GPX understood that CVD deposits were being required by Commerce, the question is whether the imposition of retroactive liability was contrary to GPX's reasonable expectations.  That liability was not

effected by Commerce's actions, but by the retroactive legislation that occurred

years after GPX had made entry. At that point GPX's entries were so far removed

from the deposits still held by Customs because GPX's was seeking to preserve

lawful its interests that it would be unreasonable to find that settled expectations

had not yet accrued.

## III.   THE ACT VIOLATES THE *EX POST FACTO* CLAUSE

Contrary to the arguments by Commerce and Petitioners, the March 2012

Act is "so punitive in purpose or effect" as to negate any general congressional

intent to deem the new law to be civil. The change in the law is thus punitive, and

subject to the prohibition against retroactivity under the *Ex Post Facto* Clause of

the Constitution. U.S. Const. art. III, § 9, cl. 3. The relevant factors set forth in

*Smith v. Doe*, 538 U.S. 84 (2003), support finding the law to be punitive in purpose

and effect. As this court has noted, this further inquiry under *Smith* goes beyond

Congress's overall intent, and instead "examines the law's specific objectives and

effects." *Wireking*, 745 F.3d at 1204.

We recognize that *Wireking* found the March 2012 Act to be non-punitive,

and not subject to the *Ex Post Facto* Clause. For the reasons set forth below, we

respectfully disagree with this conclusion and request the court to reach a different

decision. *Wireking* did not have the benefit of the parties' arguments about the

factors in *Smith*. *Wireking* also focused too much on the March 2012 Act in

general, and did not properly address the specific features of the law – the retroactivity provisions – subject to this challenge.  Moreover, this particular case involves an excessive period of retroactivity that goes too far and breaks any rational connection to any plausible non-punitive purpose.

At the outset, we note that in the context of trade remedy statutes, some of the factors in *Smith* are more relevant than others.  That is why the more general factors set forth in *Smith* and the specific factors more relevant to trade remedy statutes set forth in *Huayin Foreign Trade Corp. v. United States*, 322 F.3d. 1369 (Fed Cir. 2003), should be considered together.  We agree that "the component parts of *Huayin* test largely overlap aspects of the Supreme Court's seven-part test."  *Wireking*, 745 F.3d. at 1205.

Several of the *Smith* factors are less directly relevant.  But even so, contrary to *Wireking*, 745 F.3d. at 1205, these factors do not cut against the claims here. Under the first factor, although countervailing duties in general have not traditionally been regarded as "punishment," that history also reflects that countervailing duties have not been applied to NMEs in this way.  There is no tradition at all of applying countervailing duties on top of antidumping duties with no possibility of adjustment.  This feature of the March 2012 Act is new and unique.

Under the second factor, although countervailing duties are not an affirmative "restraint" against a person, they very much restrain the imports. By definition, when analyzing the punitive nature of a non-criminal statute, one must look for restraints other than imprisonment of a person. Here again, the tradition has been to address unfairness with special antidumping rules, not to impose additional restraints on imports beyond those special antidumping duties.

Under the third factor, the retroactive provisions of the March 2012 Act promote the traditional aims of punishment. Although prospectively the changed law may be remedial, the retroactive imposition of countervailing duties against the Appellant GPX serves no remedial purpose at all. Rather, such retroactive duties are retribution for past acts, and not remedial. Thus Congressman Levin explained the Act "will send a clear signal, especially with an overwhelming vote, that there are clear consequences when a nation violates the rules." Applying the Countervailing Duty Provisions to Nonmarket Economy Countries, 158 Cong. Rec. H1166, H1167 (Mar. 6, 2012). Such retribution is very much a traditional aim of punishment.

Even the sixth and seventh factors, the focus on a finding of *scienter* and whether the behavior is a already a crime, are not completely irrelevant here. Under Section 1(b)(3), the retroactive application of the March 2012 Act applies to

all proceedings – including "criminal proceedings." Although certainly less common in this context, these factors are not completely irrelevant.

The more important *Smith* factors are the fourth factor, whether the Act "has a rational connection to a non-punitive purpose," and the fifth factor whether the Act is "excessive with respect to this purpose." *Smith*, 538 U.S. at 97; *Wireking*, 745 F.3d. at 1204. Contrary to *Wireking*, both of these factors support finding the March 2012 Act to be punitive in purpose and effect, and thus subject to the *Ex Post Facto* Clause.

Although the trade laws in general may be remedial in nature, the specific retroactive provisions of the March 2012 Act are decidedly not remedial. We agree that this particular factor is "the most relevant to this case," *Wireking*, 745 F.3d. at 1205, but we disagree that the changed CVD law does not depart from this remedial purpose. When discussing this factor, *Wireking* addresses only the prospective features of the March 2012 Act, *Wireking*, 745 F.3d. at 1206, features that are not in dispute. *Wireking* never addresses or explains why these retroactive features are remedial and have a non-punitive purpose.

In fact, these retroactive features are punitive, particularly in this case. Any remedial purpose – any effort to level the playing field – is served by the prospective application of the changed law. That is why when a normal trade case is filed, the duties apply only prospectively, after certain conditions have been met.

That prospective focus is required both by U.S. law and by U.S. WTO obligations. A new trade case in the present does not justify duties going back years in the past. Similarly, if Congress decides in 2014 that a countervailing duty is necessary for some remedial purposes, there is nothing remedial about imposing that new duty retroactively back to imports that occurred in 2008. There is no need to level the playing field back in 2008 – that competitive game is long over.

The retroactive aspects of the March 2012 Act are also decidedly excessive. They are excessive because there is no proper remedial purpose to such retroactive duties on imports more than five years before the law changed, as discussed above. They are also excessive because they go beyond Congress's own definition of what would be proportional and remedial – countervailing duties should apply only to the extent there is some unfairness not already being sufficiently addressed by the special antidumping duties for NME countries.

*Wireking* calls this distinction between the retrospective and prospective aspects of the Act a "mistake," *Wireking*, 745 F.3d. at 1206, but we respectfully disagree. The prospective change to the law is not unconstitutional, and therefore the focus is properly on the unconstitutional portion of the March 2012 Act. That is why Appellants focus on the retroactive aspects, and argued specifically that Section 1(b) should be severed from the rest of the March 2012 Act. GPX Br. at 60-61.

*Wireking* also calls the retroactive double counting a "small imprecision," *Wireking*, 745 F.3d. at 1206, but in making this statement ignores two key points. First, there is a critical distinction between considering an issue and ignoring an issue. Some degree of imprecision in how one might find double counting or measure double counting may be permissible. But to affirmatively preclude even considering the issue is different. That is not imprecise or imperfect. That is a fundamental flaw.

Second, even if the double counting is small, it is still excessive with respect to any proper purpose. Sanctioning countervailing duties now on imports that occurred five years earlier is not remedial at all. The remedy for the domestic industry has already occurred – the imports have been restricted in the past. Moreover, any proper remedial function is – at most – the amount not addressed by the special antidumping duties. And the retroactive countervailing duties here go beyond that – they exceed that proper purpose, and are thus excessive.

Moreover, the very language and structure of the March 2012 Act itself provides the "clearest proof" of these non-remedial and excessive features. The unconstitutional error by Congress – imposing countervailing duties retroactively without any possibility of offsets for double counting – is explicit without any ambiguity on the face of the Act. The issue is not the amount of double counting or the certainty with which the agency might measure such double counting.

-28-

Rather, the unconstitutional flaw is explicitly to refuse even to allow the inquiry. Although the constitutionality may not depend on the results of such a "complex and unclear calculation," *Wireking*, 745 F.3d. at 1207, the constitutionality does depend on whether parties are allowed to consider the issue at all.

Essentially, Congress has said that these retroactive duties will be imposed without any effort at all to ensure they are in fact remedial and proportional. In sharp contrast to the prospective application of the March 2012 Act, the rigid and mechanical retroactive application is punitive and excessive. Particularly with regard to these Appellants, the long period of retroactivity makes the retroactive duties especially punitive and thus unconstitutional.

## CONCLUSION AND RECOMMENDED APPELLATE REMEDY

For these reasons, we respectfully request that this court hold: first, that section 1(b) of the March 2012 Act is unconstitutional; and second, that it is possible to sever section 1(b) from the remainder of the March 2012 Act, and therefore Commerce's CVD determination and CVD order are unlawful under this court's December 2011 *GPX V* decision.

Respectfully submitted,

/s/ Daniel L. Porter

Daniel L. Porter
James P. Durling
Matthew P. McCullough
Claudia D. Hartleben

**Curtis, Mallet-Prevost, Colt & Mosle LLP**
1717 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 452-7373

Counsel for Plaintiff-Appellants

## CERTIFICATE OF SERVICE

### GPX International Tire Corporation, Hebei Starbright Tire Co., Ltd., Tianjin United Tire & Rubber International Co., Ltd., et al v. United States

### CAFC Court No. 2014-1188

I hereby certify that on July 28, 2014, copies of the foregoing were served upon the following by electronic means (CM/ECF):

> Alexander V. Sverdlov, Esq.
> **U.S. Department of Justice**
> Commercial Litigation Branch – Civil Division
> P.O. Box 480
> Ben Franklin Station
> Washington, D.C. 20044
>
> Elizabeth J. Drake
> **Stewart & Stewart**
> 2100 M Street, NW, Suite 200
> Washington, D.C. 20037
>
> Mark B. Lehnardt
> **Lehnardt & Lehnardt LLC**
> 20 Westwoods Drive
> Liberty, MO 64068

> _/s/ Daniel L. Porter_____
> DANIEL L. PORTER
> dporter@curtis.com
> CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
> 1717 Pennsylvania Avenue, N.W.
> Washington, D.C.  20006
> 202-452-7340
>
> Counsel to Plaintiff-Appellants
> GPX International Tire Corp. and Hebei Starbright Tire
> Co., Ltd.

**Certificate of Compliance Pursuant to Rule 32(a)(7)(C)**

This brief has been prepared utilizing Microsoft Word 2010 using a

proportionally spaced typeface (14 point Times New Roman font).

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned certifies that this

brief complies with the requirement of Fed. R. App. P. 32(a)(7)(B)(i).

Specifically, excluding those exempted portions of the brief, as set forth in Fed. R.

App. P. 32(a)(7)(B)(iii), this brief contains 6,961 words.  In accordance with Fed.

R. App. P. 32(a)(7)(C), this certified word count is based on the word count feature

in the word processing system (Microsoft Word) used to prepare this brief.

/s/  Daniel L. Porter
Daniel L. Porter

Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 452-7373

Counsel for Plaintiff-Appellants